Eric P. Waeckerlin – *Admitted Pro Hac Vice*
Kathleen Schroder – *Admitted Pro Hac Vice*
Erin K. Murphy – Wyo. Bar No. 7-4691
Davis Graham & Stubbs LLP
1550 17th Street, Suite 500
Denver, Colorado  80202
Tel:    303.892.9400
Fax:    303.893.1379
Eric.Waeckerlin@dgslaw.com
Katie.Schroder@dgslaw.com
Erin.Murphy@dgslaw.com
*Attorneys for Petitioners Western Energy Alliance and
Independent Petroleum Association of America*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| WESTERN ENERGY ALLIANCE, and the INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA, | ) ) ) | |
| Petitioners, | ) ) | Civil Case No. 2:16-cv-00280-SWS |
| v. | ) ) | |
| SALLY JEWELL, in her official capacity as Secretary of the United States Department of the Interior, and BUREAU OF LAND MANAGEMENT, | ) ) ) ) ) | |
| Respondents. | ) ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

4231789

# TABLE OF CONTENTS

Page

I.  BACKGROUND ..................................................................................... 3

II.  PRELIMINARY INJUNCTION STANDARD .......................................... 7

III.  PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS OF
      THEIR CLAIMS ................................................................................ 8

    A.  Congress Has Not Delegated Any Authority to BLM to Establish
        a Comprehensive Air Quality Regulatory Scheme .......................... 9

        1.  The CAA Precludes BLM from Establishing a
            Comprehensive Air Quality Regime on Federal Lands .................... 10

            a)  The CAA Grants Exclusive Authority to the EPA,
                the States, and the Tribes to Comprehensively
                Regulate Air Quality .............................................................. 10

            b)  The CAA Depends on a Carefully Tailored
                Cooperative Federalism Framework between EPA,
                States, and Tribes—not BLM ................................................. 13

            c)  The Rule Conflicts with the Statutory Structure
                Congress Prescribed for Regulating Emissions
                from Oil and Natural Gas Facilities ....................................... 16

        2.  FLPMA Does Not Authorize BLM to Establish a
            Comprehensive Air Quality Regulatory Scheme ............................. 21

        3.  The Mineral Leasing Act Does Not Grant BLM Authority
            to Establish a Comprehensive Air Quality Regulatory
            Scheme ....................................................................................... 24

        4.  No Other Authority Cited by BLM Confers Authority to
            Establish a Comprehensive Air Quality Regulatory
            Scheme ....................................................................................... 26

    B.  Even if the Rule is Within BLM's Authority, It Does Not Receive
        *Chevron* Deference .................................................................... 27

        1.  The Rule is Not a Permissible Construction of BLM's
            Authority under the MLA to Manage Waste .................................. 28

            a)  The Rule's Definition of "Unavoidably Lost" is
                Inconsistent with the MLA. .................................................. 28

b)      The Rule Will Lead to More Waste through Premature Abandonment of Wells...........................................32

c)      Section 3179.11 Inappropriately Relies on BLM's Authority Over Waste to Defer Approvals of APDs and Limit Production.....................................33

2.      The Rule's Assessment of Royalty on All Unavoidably Lost Production is Not Entitled to Deference. ...................................35

3.      BLM Lacks Authority to Apply Subpart 3179 to Nonfederal Wells Within a Communitized Area or Participation Area. ........................................................37

C.      The Rule is Unlawful and Must Be Set Aside under the Administrative Procedure Act, 5 U.S.C. § 706..............................39

1.      The Rule is Arbitrary and Capricious because BLM Has Not Adequately Identified or Defined the Problem It Seeks to Address ................................................41

2.      The Requirement to Prepare a Waste Minimization Plan Arbitrarily Compels Disclosure of Confidential, Proprietary, and Competitive Information.........................43

3.      The Rule's Cost-Benefit Methodologies and Conclusions are Unreasonable..................................................................44

D.      BLM Must Provide the Public with an Additional Opportunity to Comment on the Revised Rule ....................................46

IV.      COMPLIANCE WITH THE RULE WILL IRREPARABLY HARM PETITIONERS ................................................................48

V.      THE EQUITIES WEIGH IN FAVOR OF AN INJUNCTION...............................52

VI.      AN INJUNCTION IS IN THE PUBLIC INTEREST .............................................53

VII.      CONCLUSION........................................................................54

Petitioners Western Energy Alliance (Alliance) and the Independent Petroleum Association of America (IPAA) respectfully submit this memorandum in support of Petitioners' Motion for Preliminary Injunction. Petitioners request that the Court enjoin the Bureau of Land Management's (BLM) implementation of the rule related to the reduction of venting and flaring from oil and gas production on federal and Indian lands, Waste Prevention, Production Subject to Royalties, and Resource Conservation, 81 Fed. Reg. 83,008 (Nov. 18, 2016) (to be codified at 43 C.F.R. pt. 3100, subpts. 3160 and 3170) (the Rule)[1] prior to its effective date of January 17, 2017, pending resolution of this litigation. The Rule represents unlawful and unconstitutional agency action. The application of the Rule will cause the Petitioners and Petitioners' members irreparable harm, and the balance of equities and public interest favor a preliminary injunction. The Court has the authority to set aside an agency action that it finds to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or in excess of such agency's jurisdiction. Accordingly, the Court should grant the motion and enjoin implementation of the Rule.

## I.     BACKGROUND

In June 2013, the White House published President Obama's Climate Action Plan aimed at reducing nationwide greenhouse gas emissions 17 percent below 2005 levels by 2020. *See* White House, *The President's Climate Action Plan* 4 (June 2013).[2] As part of the Climate Action Plan, the White House announced its "Strategy to Reduce Methane Emissions" in March 2014 (Methane Strategy) with the goal to "cut methane emissions from the oil and gas sector by

---

[1] *Attached hereto* as Exhibit 1.

[2] https://www.whitehouse.gov/sites/default/files/image/president27sclimateactionplan.pdf.

40–45 percent from 2012 levels by 2025."[3]  This even though methane emissions from the natural gas sector have decreased 15 percent since 1990 despite a 54 percent increase in natural gas production over the same time.  *See* Environmental Protection Agency 3-68, *Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2014* (2016).[4]

One key action item in the Methane Strategy was "BLM's updated standards to reduce venting and flaring from oil and gas production on public lands."  In 2014, BLM initiated outreach efforts regarding such standards, leading to the proposed rule in February 2016 and the final Rule eight months later.[5]  81 Fed. Reg. 6,616 (Feb. 8, 2016); [6] 81 Fed. Reg. 83,008 (Nov. 18, 2016).

The Rule combines several distinct regulatory concepts, namely air quality regulation and royalties paid on federal oil and gas.  Most significant, the Rule limits emissions of methane and volatile organic compounds (VOCs) from new and existing oil and gas wells that develop federal and Indian leases.  To do so, the Rule prohibits venting of gas from oil and gas wells, requires operators to capture rather than flare gas from oil wells, requires emission controls on certain oil and gas equipment, obligates operators to detect and repair leaks that emit methane and VOCs, and requires operators to submit plans to minimize emissions with applications for permit to drill

---

[3] *See* White House, *Climate Action Plan Strategy to Reduce Methane Emissions* (Mar. 2014), https://www.whitehouse.gov/sites/default/files/strategy_to_reduce_methane_emissions_2014-03-28_final.pdf.

[4] *Available at* https://www.epa.gov/sites/production/files/2016-04/documents/us-ghg-inventory-2016-main-text.pdf.

[5] Despite the Rule's complexity, BLM finalized it on November 18, 2016—a mere eight months after it was proposed.  Likely not by coincidence, the Rule takes effect January 17, 2017, four days before the new President is sworn into office.  As a result, the President cannot suspend the Rule's effect upon taking office.  *See* Maeve P. Carey, Cong. Research Serv., R42612, *Midnight Rulemaking* 3–18 (2012).

[6] *Attached hereto* as Exhibit 2.

(APDs), among other requirements. Failure to adhere to these air quality requirements may result in enforcement actions by BLM.

Additionally, the Rule redefines lessees' royalty obligations to the United States and tribes by limiting the circumstances in which oil and gas is "unavoidably lost" and thus not royalty-bearing. In doing so, the Rule departs from longstanding practice by replacing provisions of the 1979 Notice to Lessees and Operators of Onshore Federal and Indian Oil and Gas Leases, Royalty or Compensation for Oil and Gas Lost (NTL-4A).[7] Finally, the Rule defines when lessees may use produced oil and gas used for operations and production without incurring royalty obligations and allows BLM to increase the royalty rate on production from new oil and gas leases.

Although the Rule imposes extensive requirements to limit emissions of methane and VOCs, BLM does not purport to enjoy any authority to regulate air quality under the Clean Air Act (CAA). Rather, as authority for the Rule, BLM cites first and primarily to its authority to manage waste of oil and gas under the Mineral Leasing Act (MLA) and second to its general land management authority under a number of other statutes, including the Federal Land Policy and Management Act (FLPMA). *See* 81 Fed. Reg. at 83,019–21. BLM's characterization of its authority misstates the agency's intentions and ignores the Rule's effect. The Rule ushers in a comprehensive air quality regulatory regime governing all oil and natural gas production facilities that develop federal and Indian leases. The Rule comprehensively regulates how methane and VOCs may be emitted from new and existing oil and gas wells, equipment, and facilities in a manner that BLM acknowledges is modeled largely upon air quality regulations

---

[7] *Attached hereto* as Exhibit 3. NTL-4A had the force and effect of a regulation. *See* 43 C.F.R. § 3162.1(a) (2015).

already adopted by several states and Environmental Protection Agency (EPA).  *See* 81 Fed. Reg. at 83,017–19.

A close examination of the Rule and its justifications reveals BLM's overarching intent to regulate air quality.  The Rule was born of administrative fiat—the White House's Climate Action Plan to reduce air pollution.  BLM also repeatedly makes air quality choices, not waste or safety choices, such as the prohibition on venting in favor of flaring.  *See, e.g.*, 43 C.F.R. § 3179.6; *see also* 81 Fed. Reg. at 83,011 ("This Rule prohibits venting of natural gas, except under certain specified conditions . . . .").

BLM lacks any legally justifiable rationale for prohibiting venting while permitting flaring.  From a waste prevention perspective, venting and flaring are indistinguishable—the gas is not captured or profitably sold and the same amounts of hydrocarbons are lost.  Treating gas capture (i.e., sent to a pipeline) and flaring as two equally acceptable outcomes while prohibiting venting can only be justified if the goal is to protect air quality instead of reducing waste.[8]

BLM also acknowledges that this Rule has widespread "overlapping" and "complementary goals" with EPA and the state "such as improving air quality."  81 Fed. Reg. at 83,010.  The Rule is discussed frequently in air quality terms.  *See e.g.*, *id.* at 83,014–15 (citing global air pollution problems of smog, regional haze, particulate matter, hazardous air pollution, methane reduction, and climate change as primary benefits of the Rule).

---

[8] *See also* American Petroleum Institute (API) Comments 13 (April 22, 2016), *available at* https://www.regulations.gov, BLM-2016-0001-9073 ("From a resource conservation or waste prevention perspective, venting and flaring are indistinguishable—the gas is not captured or profitably sold, but it is forever 'lost' and can no longer be recovered, sold, or profitably used. Accordingly, for the stated purpose of the Rule, which is 'waste prevention' and 'resource conservation,' it should make no difference whether the lost volume is vented or flared.").

Finally, the <u>only</u> two monetized benefits of the Rule are estimated air quality benefits from methane reductions and projected cost savings to industry, where methane benefits vastly outweigh industry cost savings. *See* BLM, Regulatory Impact Analysis (RIA) 5 (Nov. 10, 2016)[9] ($189 million per year value in methane reductions in 2017 and up to $247 million per year by 2025 compared to estimated annual costs savings to the industry of $20–157million per year).[10] It is clear projected air emissions reduction benefits are driving this Rule from BLM's perspective.

Petitioners ask this Court to enjoin BLM from implementing the Rule because it exceeds BLM's authority by comprehensively regulating air quality and is arbitrary and capricious. Requiring oil and gas operators to comply with these untenable regulations effective January 17, 2017, would impose significant immediate and irretrievable costs with no meaningful benefits. It would also discourage development of resources which further the public interest without any countervailing environmental or administrative benefit. Accordingly, the Court should issue a preliminary injunction to preserve the status quo, pending a decision on the merits.

## II.  PRELIMINARY INJUNCTION STANDARD

To prevail on a motion for preliminary injunction, a movant must demonstrate: (1) a likelihood of success on the merits; (2) the movant is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of an injunction; and (4) an injunction is in the public interest. *Petrella v. Brownback*, 787 F.3d 1242, 1257 (10th Cir. 2015);

---

[9] *Available at* https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/operations-and-production/methane-and-waste-prevention-rule *and attached hereto* as Exhibit 4.

[10] The rule is estimated to also reduce significantly more VOC emissions (250,000–267,000 tons per year (TPY)) than methane emissions (175,000–180,000 TPY). RIA at 6. Perhaps because BLM recognizes it has no authority to regulate air quality, it did not monetize these VOC benefits. *Id.*

*see also Winter v. Natural Res. Defense Counsel*, 555 U.S. 7, 20 (2008); *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012). The purpose of a preliminary injunction is to "preserve the relative position of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing[.]" *Id.* (citations omitted). *See also Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009); *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). The grant or denial of a preliminary injunction lies within the sound discretion of the district court. *Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 557 (10th Cir. 1984).

## III. PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

Petitioners are likely to succeed on the merits of their petition because the Rule cannot survive judicial review. The Administrative Procedure Act (APA) requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; or "(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2). A court must conduct a "substantial inquiry" when reviewing agency action. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (citation omitted). "[T]he essential function of [this substantial inquiry] is a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious, or an abuse of discretion." *Id.*

The Rule fails all three *Olenhouse* determinations. With respect to the first *Olenhouse* determination, the Rule is "in excess of statutory jurisdiction, authority, or limitations, or short of

statutory right[]" because Congress has not granted BLM the authority to regulate air quality. 5

U.S.C. § 706(2)(C); *see also Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529

U.S. 120, 161 (2000) ("an administrative agency's power to regulate in the public interest must

always be grounded in a valid grant of authority from Congress"). Applying the second and

third *Olenhouse* determinations, even if the Court were to determine BLM acted within its

statutory authority, the Rule constitutes procedurally deficient, arbitrary, and capricious agency

rulemaking. *See, e.g.*, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 56 (1983) (requiring a rational connection between the facts found and choice

made). In addition, the Rule is not entitled to judicial deference because BLM does not

reasonably construe its authority to manage waste under the MLA.[11] *See Chevron USA, Inc. v.*

*Natural Res. Defense Council*, 467 U.S. 837. 844 (1984).

    A.    <u>Congress Has Not Delegated Any Authority to BLM to Establish a</u>
                <u>Comprehensive Air Quality Regulatory Scheme</u>.

        This Court owes no deference to BLM because, by establishing a comprehensive air

quality scheme, it has acted without congressionally delegated authority. Before a court may

analyze whether an agency has lawfully exercised its discretion, it must first look to "whether

Congress has delegated . . . the authority to provide an interpretation that carries the force of

---

[11]As discussed in detail in Section III.B, *infra*, when an administrative agency promulgates a rule
or regulation pursuant to statutory authority, the court's analysis is governed by *Chevron U.S.A.
Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The *Chevron* inquiry begins with
the threshold question of whether the agency has received "a congressional delegation of
administrative authority." *Adams Fruit Co., Inc. v. Barrett*, 494 U.S. 638, 649 (1990)
("Although agency determinations within the scope of delegated authority are entitled to
deference, it is fundamental that an agency may not bootstrap itself into an area in which it has
no jurisdiction.") (internal quotation and citation omitted). Therefore, this "precondition" of
*Chevron* tracks the first *Olenhouse* determination of whether the agency acted within the scope
of its authority. *Id. See Am. Wildlands v. Browner*, 94 F. Supp.2d 1150, 1160 (D. Colo. 2000),
*aff'd*, 260 F.3d 1192 (10th Cir. 2001) (noting that where an agency "is <u>entrusted</u> to administer" a
"statutory scheme," it may be entitled to deference under *Chevron*) (emphasis added).

law." *City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1876 (2013). "Regardless of how serious the problem an administrative agency seeks to address . . . it may not exercise that authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000); *see also Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress"). Contrary to BLM's assertions, the CAA, FLPMA, MLA, and the host of other statutes cited in the Rule provide no authority for BLM to establish a comprehensive air quality regulatory framework for air emissions from oil and gas wells on federal lands.

> 1. The CAA Precludes BLM from Establishing a Comprehensive Air Quality Regime on Federal Lands.

BLM has promulgated subpart 3179 without congressionally delegated authority and inconsistently and in conflict with the administrative structure Congress enacted into law to control air pollution—the CAA—in three major respects: (1) the Rule usurps the exclusive authority Congress delegated under the CAA to EPA, states, and tribes to manage air quality; (2) the Rule upends the carefully crafted cooperative federalism framework of the CAA; and (3) the Rule conflicts with the narrowly tailored statutory scheme Congress authorized for regulating air emissions from oil and natural gas sources.

> a) The CAA Grants Exclusive Authority to EPA, States, and Tribes to Comprehensively Regulate Air Quality.

In December 1970, President Nixon created EPA in large part to address air quality regulation in a cohesive and comprehensive manner. *See* EPA Order 1110.2, *Initial Organization of the EPA* (Dec. 4, 1970) ("the principal air pollution programs of the [Air Pollution Control Office] include (1) a systematic Federal-state-local regulatory program for stationary source emissions[.]"). Later that same month, Congress passed the Clean Air

Amendments of 1970, ushering in the modern version of the CAA. *See* Pub. L. No. 91-604, 81 Stat. 486 (1970). The 1970 amendments granted the newly minted EPA and the respective states exclusive authority over air quality regulation. *Id.*; *see also* H.R. Rep. No. 91-1783, at 42 (1970) (reconciling the House and Senate versions of the bill to reflect that all CAA functions are to be carried out by EPA); Reorganization Plan No. 3 of 1970, 35 Fed. Reg. 15,623 (Oct. 6, 1970) (reprinted at 5 U.S.C. app. 1 (1994)) (describing EPA's "broad mandate" in its administration of the CAA). The 1970 amendments did not grant air quality management authority to any other federal agency. *Id.* Courts continue to recognize that among the federal agencies only EPA has been delegated authority to regulate air quality. *See, e.g.*, *Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3rd Cir. 2013) ("The Clean Air Act, 42 U.S.C. § 7401 *et seq*., enacted in 1970, is a comprehensive federal law that regulates air emissions under the auspices of the [EPA]").

The plain language and structure of the CAA reflects EPA's exclusive authority. For example, EPA is the only federal agency authorized to prescribe all regulations "as are necessary to carry out [its] functions under [the CAA]." 42 U.S.C. § 7601(a)(1). The term "air pollution control agency" is confined to state, local, regional, or Tribal governments, and does not include other federal agencies. *Id.* § 7602(b). Congress delegated emergency enforcement powers only to EPA and no other federal agency. *Id.* § 7603. EPA and no other federal agency is authorized to enforce CAA violations, including assessing administrative, civil, and criminal penalties. *Id.* § 7413. And only EPA may assess and collect penalties for noncompliance with the CAA. *Id.* § 7420.

EPA carries out its CAA duties in many ways, but none more important than through the National Ambient Air Quality Standards (NAAQS)/State Implementation (SIP) process. EPA

establishes the NAAQS for six criteria pollutants (lead, carbon monoxide, sulfur oxides, nitrogen oxides, particular matter, and ozone) for the entire nation.  42 U.S.C. §§ 7408, 7409.  The CAA then delegates primary NAAQS implementation to the states, local governments, and tribes through the SIP process.  *See* 42 U.S.C. § 7410; s*ee also U.S. Magnesium, LLC v. U.S. E.P.A.*, 690 F.3d 1157, 1159 (10th Cir. 2012) (the CAA's cooperative federalism framework is driven by the NAAQS/SIP process).  This process is exclusively between EPA and the states and tribes; agencies like BLM are not authorized to establish or change the NAAQS, develop or implement SIPs, or review and approve/disapprove SIPs.

Still other provisions of the CAA authorize only EPA to enact nationwide uniform emission standards for new, modified, and existing industrial sources irrespective of the NAAQS.  *See* 42 U.S.C. §§ 7411(b) (New Source Performance Standards (NSPS)), 7411(d) (Existing Source Performance Standards), 7412 (National Emission Standards for Hazardous Air Pollution (NESHAP)).  Once established, implementation and enforcement of NSPS/NESHAP standards is often delegated to the states with EPA oversight.  *Id*.

In the CAA, Congress acknowledged Federal Land Managers (FLMs) such as BLM.  But their authority is extremely narrow and limited to notice, coordination, and consultation and only in certain circumstances or geographic locations.  *See, e.g.,* 42 U.S.C. §§ 7475(d) (charging EPA and the states with coordinating with FLMs in Class I areas (wilderness or national parks) during major source preconstruction permit review), 7421 (requiring state/FLM consultation in certain circumstances), 7474 (requiring notice to FLMs prior to area redesignation), 7491 (requiring review of Class I areas for purposes of visibility protection), 7491(d) (requiring EPA and the states to consult with FLMs regarding visibility protection in Class I areas).

There simply is no provision of the CAA that grants BLM the authority to promulgate comprehensive air quality regulations like those under the Rule. BLM itself acknowledges it "does not regulate air quality." *See* BLM Colorado NEPA Air Quality (Mar. 23, 2016).[12] Accordingly, the Rule usurps the exclusive authority delegated by Congress to EPA, the states, and the tribes under the CAA and fails the first *Olenhouse* test.

        b)       <u>The CAA Depends on a Carefully Tailored Cooperative Federalism Framework between EPA, States, and Tribes—not BLM</u>.

By establishing a comprehensive air quality regulatory scheme for oil and gas facilities on federal lands, the Rule upends the intricate cooperative federalism structure Congress established in the CAA. Courts have consistently recognized the founding and fundamental principle of cooperative federalism underlying the CAA. *See Train v. Natural Res. Defense Council, Inc.*, 421 U.S. 60, 79–80 (1975) (discussing the CAA's "division of responsibilities" between EPA and the states); *U.S. Magnesium, LLC v. EPA*, 690 F.3d 1157, 1159 (10th Cir. 2012) ("The CAA uses a cooperative-federalism approach to regulate air quality"). Although EPA is the lead federal agency, Congress made clear that "at its source [air pollution prevention and control] is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3); *see also id*. § 7407(a). Perhaps more so than any other federal environmental statute, the CAA only functions through cooperative federalism; at no point has Congress strayed from this "core principle." *EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584, 1602 n.14 (2014); *Oklahoma v. EPA*, 723 F.3d 1201, 1204 (10th Cir. 2013) (recognizing the CAA's cooperative federalism framework).

---

[12] https://www.blm.gov/co/st/en/BLM_Information/nepa/air_quality.html.

The EPA/state cooperative federalism structure is critical in addressing the complex, multi-faceted problem of air pollution. The CAA is "without a doubt the most complex environmental regulatory scheme." *Nw. Envtl. Def. Ctr. v. Owens Corning Corp.*, 434 F. Supp.2d 957, 961 (D. Ore. 2006) (citation omitted). The "complex balancing" required under the CAA is entrusted to "EPA in the first instance, in combination with state regulators." *Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 427–28 (2011) (adding that "[i]t is altogether fitting that Congress designated an expert agency, here, EPA, as best suited to serve as primary regulator [in the case of greenhouse gases]").

The NAAQS/SIP process embodies the CAA's complex balancing. Congress left significant discretion to the states and local governments in the SIP process. *See* H.R. Rep. No. 95-294 (1976), *reprinted in* 1977 U.S.C.C.A.N. 1077, 1290–92 (Congress created flexibility in the SIP process to allow states to make reasoned choices in designing and implementing SIPs); *see also* 42 U.S.C. § 110(a)(2). Through SIPs, states can address highly technical and unique state, local, and regional air pollution issues in the most effective manner. Put another way, Wyoming must tackle different air pollution issues and in very different ways than, for example, Oklahoma. The Rule turns this delicate balance on its head, duplicating and conflicting with existing state regulations and policymaking functions and upsetting the core cooperative federalism principle underlying the CAA.[13]

---

[13] *See, e.g.*, Colorado Oil and Gas Association Comments 8 (April 22, 2016), *available at* https://www.regulations.gov, BLM-2016-0001-9058 ("BLM's proposal also would flip on its head the governing structure of the CAA— cooperative federalism—by mandating federal standards without participation, either during development or implementation, of the states. This is fundamentally inapposite to how Congress intended air quality regulation to work in this country"); Wyoming Department of Environmental Quality (DEQ) Air Quality Division Comments 3–4 (April 22, 2016), BLM-2016-0001-9061.

Moreover, through nearly 50 years of experience, EPA and the states have developed the expertise needed to address air pollution. In contrast, until now BLM has never attempted to regulate air quality via national regulations and lacks the experience to do so. The fact BLM frames this as a "waste" Rule—as it must—does nothing to remedy these problems or somehow shift congressional authority for this Rule to BLM.

In addition, BLM failed to conduct a federalism assessment. Executive Order 13,132 requires agencies to closely examine the "constitutional and statutory authority supporting any action that would limit the policy making discretion of the States." 64 Fed. Reg. 43,255, 266 (Aug. 10, 1999). BLM effectively ignores this, concluding "the [R]ule would not have a substantial direct effect on the States, the relationship between the national government and the States, or the distribution of power responsibilities among the levels of government" and therefore "does not have sufficient Federalism implications to warrant preparation of a Federalism Assessment." 81 Fed. Reg. at 83,071.

If not set aside, the Rule would set a dangerous precedent by allowing a federal agency other than EPA to significantly and materially impinge upon EPA's exclusive CAA jurisdiction without any meaningful discussion of the explicit statutory or constitutional authority to do so. One can only imagine the numerous other federal agencies eager to play a role in this arena; for example, upholding the Rule would conceivably pave the way for the National Park Service and United States Forest Service to regulate air quality across the vast lands they manage.[14] BLM's

---

[14] In fact, just one working day after this Rule was published, the United States Geological Survey noticed a meeting "to work to develop a publicly accessible database on the greenhouse gas emissions associated with extraction of fossil fuels from federal lands." 81 Fed. Reg. 83,279 (Nov. 21, 2016).

novel attempt to upend the careful balance of the CAA's cooperative federalism framework is dangerous and unlawful.

c)     <u>The Rule Conflicts with the Statutory Structure Congress Prescribed for Regulating Emissions from Oil and Natural Gas Facilities</u>.

With respect to regulating emissions from the oil and natural gas sector specifically, Congress has expressly provided EPA and the states with a comprehensive framework for doing so. The Rule ignores and conflicts with this framework. In Section 111, Congress authorized EPA to establish standards of performance for new, modified, and in certain cases existing industrial sources. *See generally* 42 U.S.C. § 7411. Section 111 complements the NAAQS/SIP process by "prevent[ing] new pollution problems, especially the deterioration of air quality in areas where existing air quality levels exceed the promulgated air quality standards." *Nat'l Asphalt Pavement Ass'n v. Train*, 539 F.2d 775, 783 (D.C. Cir. 1976). Under this section, Congress authorized EPA to establish technology-based control standards for certain industrial source categories located anywhere in the United States, irrespective of the ambient air quality (i.e., the NAAQS). *See* 42 U.S.C. § 7411. To list a source category, EPA must first find "it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." *Id.* at § 7411(b)(1)(A). This is known as a "significant contribution" finding.

EPA listed the Crude Oil and Natural Gas Production as a Section 111 source category in 1979. 44 Fed. Reg. 49,222 (Aug. 21, 1979). The primary catalyst for this listing was to address emissions of VOCs—the same pollutant BLM now purports to address in this Rule. *See id.* In 1985, EPA published its first and second NSPS regulations for the oil and natural gas source category, addressing VOCs from leaking components at onshore natural gas processing plants and sulfur dioxide emissions from natural gas processing plants. *See* 40 C.F.R. pt. 60, subpts.

KKK and LLL. EPA did not promulgate another NSPS for the source category for another 27 years.

In 2012, EPA finalized a new oil and natural gas NSPS in regulations known as "Quad O." 77 Fed. Reg. 49,490 (Aug. 16, 2012) (codified at 40 C.F.R. pt. 60, subpt. OOOO). In many and significant ways, the Quad O regulations broadened the 1979 source category to encompass a majority of the upstream oil and natural gas exploration and production segment.[15] As with any NSPS, Quad O regulations apply to affected facilities independent of ambient air quality or land ownership. As a result, Quad O regulations apply to the same new and modified sources on federal and Indian leases BLM now seeks to regulate.

On June 3, 2016, EPA, again, promulgated a suite of new NSPS requirements for the oil and natural gas source category, this time "setting standards for both greenhouse gases (GHGs) and [VOCs]." 81 Fed. Reg. 35,824 (June 3, 2016) (codified at 40 C.F.R. pt. 60, subpt. OOOOa). Known as "Quad Oa," these regulations went even further than Quad O regulations, adding emission limits and other requirements to pieces of equipment and activities not previously regulated by Quad O and further addressing other requirements already established by Quad O. *Id.* at 35,825–26. As with the Quad O regulations, Quad Oa regulations apply irrespective of ambient air quality and independent of land ownership, including at applicable facilities on federal and Indian leases subject to this Rule.

---

[15] Quad O regulates "[VOC] emissions from gas wells, centrifugal compressors, reciprocating compressors, pneumatic controllers, storage vessels and leaking components at onshore oil and natural gas processing plants, as well as sulfur dioxide (SO2) emissions from onshore natural gas processing plants." *Id.* at 49,492. EPA twice refined its Quad O regulations through additional requirements via the CAA's administrative reconsideration process. 79 Fed. Reg. 79,018 (Dec. 31, 2014); 78 Fed. Reg. 58,416 (Sept. 23, 2013).

Thus, both Quad O and Quad Oa already regulate a substantial portion of the facilities subject to this Rule. Accordingly, BLM's characterization of this Rule as an "overlapping regulatory regime" is accurate. Unfortunately, BLM's attempts to "minimize regulatory overlap" do nothing to change the fact the Rule was promulgated without statutory or constitutional authority. *See* 81 Fed. Reg. at 83,013.

Several obvious problems arise from the fact BLM is not subject to the statutory requirements Congress mandates EPA adhere to when promulgating NSPS. For example, Section 111(b) requires EPA to list the source category only after making a "significant contribution" finding. 42 U.S.C. § 7411(b)(1)(A). BLM made no such finding either for the source category or pollutant(s).[16]

Section 111 also narrows the standards EPA may actually promulgate, allowing only emissions achievable through "the <u>best system of emission reduction</u> which [taking into account costs] the Administrator determines has been adequately demonstrated." 42 U.S.C. §7411(a)(1) (emphasis added); *see also Sierra Club v. Costle*, 657 F.2d 298, 330 (D.C. Cir. 1981). Known as "BSER," it requires EPA to conduct a rigorous analysis on a pollutant- and control-specific basis for every proposed control standard. If a given control standard is too expensive based on the cost per ton of pollutant reduced, EPA will determine that the control may not go forward. *See, e.g.*, 77 Fed. Reg. at 49,520 (EPA determining controls requiring electricity were not cost-

---

[16] The Quad O and Oa rules are currently in the early stages of litigation before the D.C. Circuit. *See North Dakota v. U.S. Envtl. Prot. Agency*, No. 16-1242 (D.C. Cir. 2016). One prominent issue likely to be raised in that litigation is whether EPA unlawfully expanded the scope of the 1979 "Crude Oil and Natural Gas Production" source category when it issued Quad O and Quad Oa without making a sufficient significant contribution finding. Should the court invalidate EPA's actions in this respect, it would arguably invalidate much of this Rule.

effective and, therefore, not BSER). BLM conducted no such analysis for any of the air quality controls in this Rule.

Moreover, the Rule applies to older and often smaller <u>existing</u> sources not covered by EPA's NSPS rules for <u>new and modified</u> sources. 81 Fed. Reg. at 83,037 ("[T]he BLM requirements on venting from pneumatic controllers, pneumatic pumps, and storage vessels all explicitly apply to existing sources that are <u>not</u> subject to EPA's subpart OOOOa"). Yet, for most of the controls required by the Rule, BLM assumes that EPA's cost-effectiveness determinations made in Quad Oa apply equally or at least similarly. *See generally* RIA at 54–95. BLM conducted no independent analysis about whether this is actually true, and it is likely to not be given that older, existing facilities inherently have lower and declining production and are much more expensive to retrofit.

For this very reason the CAA requires EPA to undertake an entirely different rulemaking procedure for existing sources, where the states play a prominent role. 81 Fed. Reg. at 83,037. Within that process, EPA establishes "emission guidelines" for existing sources, which then must be implemented by the states through SIP-like plans. 42 U.S.C. § 7411(d)(1); 40 C.F.R. § 60.21. The state is allowed to consider, "among other factors, the remaining useful life of the existing source to which the standard applies." 42 U.S.C. § 7411(d)(1). States are expressly allowed to apply less stringent controls for existing sources. *See, e.g.*, 40 C.F.R. § 60.24 (allowing states to apply less stringent emissions standards or longer compliance schedules than EPA guidelines for existing sources because controls tend to be costlier and more difficult to install). The Rule entirely fails to account for these critical factors or otherwise conform with Section 111(d)'s

specific procedures.[17]  This is a monumental and fatal error in this Rule as "roughly 85% of wells on Federal and Indian leases are classified as low-production [existing] wells."  81 Fed. Reg. at 83,029; *see also id.* at 83,037 ("much of this rule regulates activities and areas that are not regulated by EPA"—i.e., existing sources).

Moreover, EPA recently began to exercise its authority to regulate existing oil and gas sources under Section 111(d).[18]  *See* EPA, *Oil and Gas Industry Information Requests*, (last updated Nov. 17, 2016) (seeking data "to determine how to best reduce methane and other harmful emissions from existing sources in the large and complex oil and natural gas industry").[19]

In sum, the Rule ignores the specific procedures and statutory processes for regulating new, but more importantly, <u>existing sources</u> in the oil and natural gas sector.  The Rule also goes above and beyond what EPA has already done and is in the process of doing pursuant to its CAA authority.  For these reasons, the Rule exceeds BLM's authority and ignores the specific requirements of the CAA and thus must be set aside.

---

[17] In addition, the Rule imposes controls on equipment not covered by Quad O/Oa without a BSER analysis, including under Sections 3179.201, requiring replacement of pneumatic controllers at existing facilities, 3179.202, requiring the installation of zero-emission pumps or a flare on all existing pneumatic pumps that are not subject to Quad Oa, and 3179.203, which requires controls on emissions from storage vessels not subject to Quad Oa.  In these respects the Rule actually exceeds the authority granted to EPA even if EPA itself elected to regulate these sources.

[18] Despite EPA's ongoing regulatory effort, BLM justifies the Rule by stating that "[g]iven the length of this process and the uncertainty regarding the final outcomes [of EPA's 111(d) rulemaking] . . . the BLM has determined that it is necessary and prudent to update and finalize this regulation at this time."  81 Fed. Reg. at 83,019.  This backwards logic highlights that BLM seeks to "jump the shark" with respect to the regulation of existing sources.  *See also* Wyoming DEQ Air Quality Division Comments at 3 (the Rule "would [] subvert pending regulatory action by the EPA [under 111(d)].").

[19] https://www.epa.gov/controlling-air-pollution-oil-and-natural-gas-industry/oil-and-gas-industry-information-requests.

2. <u>FLPMA Does Not Authorize BLM to Establish a Comprehensive Air Quality Regulatory Scheme</u>.

FLPMA confirms Congress' intent that BLM lacks authority to comprehensively manage

for air quality on the public lands because FLPMA directs that BLM defer to EPA's and states'

air quality regulations. FLPMA is solely a land use planning statute. *Norton v. S. Utah*

*Wilderness Alliance*, 542 U.S. 55, 57 (2004); *Cal. Coastal Comm'n v. Granite Rock Co.*, 480

U.S. 572, 587–88 (1987); *Wyoming v. U.S. Dep't of the Interior*, Nos. 2:15-cv-043-SWS, 2:15-

CV-041-SWS, 2016 WL 3509415, at *17 (D. Wyo. June 21, 2016). FLPMA's "purpose was to

aid in the management, disposal, and maintenance of federal public land in the nation's best

interest. *Carden v. Kelly*, 175 F. Supp.2d 1318, 1325 (D. Wyo. 2001); *see* 43 U.S.C.

§ 1701(a)(2). FLPMA directs BLM to prepare and maintain an inventory of the public lands, 43

U.S.C. § 1711, and prepare management plans for the public lands, 43 U.S.C. § 1712.[20]

Congress has "illustrated its understanding of land use planning and environmental regulation as

distinct activities by delegating the authority to regulate these activities to different agencies."

*Cal. Coastal Comm'n*, 480 U.S. at 587.

FLPMA does not authorize BLM to establish an air quality regulatory scheme for the

public lands that rivals the regulatory structure administered by EPA and implemented by the

states and tribes. FLPMA instead directs BLM to defer to existing air quality regulations,

instructing that BLM, when developing and revising land use plans, "shall . . . <u>provide for</u>

---

[20] Notably, FLPMA only applies to public lands under BLM management and provides no statutory basis for the Rule's application on Indian leases. *See* 43 U.S.C. § 1702(e) (excluding lands held for the benefit of Indians from the definition of "public lands"). BLM, however, estimates that "oil and gas wells on Indian leases accounted for roughly 15% and 11%, respectively, of the total wells on Federal and Indian lands." RIA at 119.

compliance with applicable pollution control laws, including State and Federal air . . . pollution standards or implementation plans." 43 U.S.C. § 1712(c)(8) (emphasis added).

Both the Department of the Interior (DOI) and the federal courts have confirmed that FLPMA's instruction that BLM "provide for compliance" with pollution control laws only requires BLM to defer to air quality regulations established pursuant to the CAA. The Interior Board of Land Appeals, acting on behalf of the Secretary of the Interior, *see* 43 C.F.R. § 4.1 (2015), has recognized that "FLPMA imposes on BLM only an obligation to 'provide for' compliance with applicable air quality standards, not to ensure or insure it, and that [the state] is the entity that is responsible for regulating or enforcing compliance with such standards." *Powder River Basin Res. Council*, 183 IBLA 83, 95 (2012) (emphasis added); *accord Coal. for Responsible Mammoth Dev.*, *et al.*, 187 IBLA 141, 231 (2016) (recognizing that BLM "does not itself enforce the requirements of the CAA and its State equivalent"); *Wyo. Outdoor Council*, 176 IBLA 15, 26 (2008) (explaining that "[r]egulation of air quality is governed by the CAA" and that "ensuring compliance with federal and state air quality standards falls under the administrative jurisdiction of [the state], subject to EPA oversight") (citation omitted). Federal courts have reached similar conclusions. *See, e.g.*, *WildEarth Guardians v. Bureau of Land Mgmt.*, 8 F. Supp.3d 17, 38 (D.D.C. 2014) (stating "applicable regulations require only that BLM draft land use authorizations, including leases, such that they '[r]equire compliance with air and water quality standards established pursuant to applicable Federal or State law'"); *S. Utah Wilderness Alliance v. Burke*, 981 F. Supp.2d 1099, 1112 (D. Utah 2013) (observing that "BLM ensures that all permitted activities [in a particular planning area] reference and comply with the applicable NAAQS").

Furthermore, the history of FLPMA reinforces Congress' intent that BLM defer to state and federal air quality standards.  When enacting FLPMA, Congress rejected a requirement that BLM, when developing land use plans, "consider the requirements of" state and federal pollution standards in favor of the more deferential direction that land use plans "provide for compliance" with such standards.  H.R. Rep. No. 94-1724, at 58 (1976) (reporting results of conference on Senate Bill 507); *see* S. 507, 94th Cong., at 12 (1976).  This change is consistent with the recommendations of the Public Land Law Review Commission ("Commission").[21]  Recognizing that then-emerging environmental legislation such as the CAA amendments reflected a cooperative federalism relationship with the states, the Commission opined that "[i]t would be highly inappropriate for the Federal Government to adopt, for example, standards not consistent with state standards approved by the Federal Government for waters flowing across public lands."  *One Third of the Nation's Lands:  A Report to the President and to the Congress from the Public Land Law Review Commission* 70 (1970) (emphasis added).  This concern applies equally to air quality.

Accordingly, FLPMA only provides BLM authority to ensure compliance with existing environmental regulations—in this case, air quality controls.  The Rule, however, turns FLPMA's instruction on its head.  In BLM's view, EPA and the states bear the burden of avoiding inconsistent air quality regulations.  BLM explains that compliance with EPA, state, local, or tribal requirements will meet the requirements of the Rule "if EPA and/or States and tribes have adopted requirements that are at least as effective as and would potentially overlap with" the

---

[21] FLPMA extensively incorporated many of the Commission's recommendations, which were released in June 1970 prior to the December 1970 amendments to the CAA.  *See* George Cameron Coggins, *The Law of Public Rangeland Management IV:  FLPMA, PRIA, and the Multiple Use Mandate*, 14 Envtl. L. 1, 7 (1983).

Rule. *See* 81 Fed. Reg. at 83,026. BLM's approach echoes the White House's direction that BLM "lead by example" to reduce emissions from oil and gas operations. *See* White House, *Fact Sheet: Administration Takes Steps Forward on Climate Action Plan by Announcing Actions to Cut Methane Emissions* (Jan. 14, 2015).[22] Congress never intended that BLM lead air quality regulation with states and EPA catching up. Because FLPMA directs that BLM defer to state and EPA air quality regulation, FLPMA provides BLM with no authority for the Rule.

   3. <u>The Mineral Leasing Act Does Not Grant BLM Authority to Establish a Comprehensive Air Quality Regulatory Scheme.</u>

   The MLA similarly does not authorize BLM to establish an air quality management scheme. The MLA establishes a program for leasing oil and gas resources on public lands and oil and gas resources reserved to the United States in lands otherwise patented. 30 U.S.C. §§ 181–263; 1 Law of Federal Oil and Gas Leases § 2.06 (2016). "The purpose of the [MLA] is to promote the orderly development of oil and gas deposits in publicly owned lands of the United States through private enterprise." *Geosearch, Inc. v. Andrus*, 508 F. Supp. 839, 842 (D. Wyo. 1981); *see also Arkla Exploration Co. v. Tex. Oil & Gas Corp.*, 734 F.2d 347, 358 (8th Cir. 1984). Contrary to BLM's assertions, the minerals management authority prescribed by the MLA does not allow BLM to establish a nationwide air quality regulatory framework to address emissions from oil and gas operations.

   BLM points to a handful of MLA provisions to justify its efforts to regulate air quality. BLM cites the requirement in Section 16 of the MLA that BLM ensure that lessees "use all reasonable precautions to prevent waste of oil or gas developed in the land." 81 Fed. Reg. at 83,038 (citing 30 U.S.C. § 225). BLM also observes that Section 17 of the MLA authorizes

---

[22] https://www.whitehouse.gov/the-press-office/2015/01/14/fact-sheet-administration-takes-steps-forward-climate-action-plan-anno-1.

BLM to regulate "all surface-disturbing activities conducted to any lease issued under" and to "determine reclamation and other actions as required in the interest of conservation of surface resources." *Id.* at 83,020 (citing 30 U.S.C. § 226(g)). None of these provisions, however, confers authority to regulate air quality.

Congress' direction that BLM use reasonable precautions to prevent waste does not authorize BLM to regulate air quality. With the MLA, Congress did not intend to impose unfettered discretion on BLM to regulate all impacts associated mineral development. In *Chapman v. El Paso Natural Gas Company*, the United States Court of Appeals for the District of Columbia Circuit recognized the limited nature of the MLA's grants of authority. 204 F.2d 46, 50, 51 (D.C. Cir. 1953). The court rejected the Secretary's efforts to regulate pipelines as common carriers, reasoning the MLA did not "purport to express adequate standards for guidance of the Secretary in the complex problems attendant upon such intimate regulatation of corporate affairs" as attempted by the stipulation at issue; "[h]ad Congress desired the Secretary to enter upon such comprehensive supervision of those to whom rights-of-way were granted, . . . it would have expressed its desire more clearly and in more detail." *Id.* The court further found "significant" that "for thirty-one years the Secretary of the Interior has made no such extensive effort at regulation*." Id.*

The *Chapman* court's logic is directly applicable here. Had Congress intended to authorize BLM to regulate air quality through the MLA, "it would have expressed its desire more clearly and in more detail" than passing vague references to prevention of waste and regulation of surface disturbance. *See Chapman*, 204 F.2d at 51. The MLA's general direction to minimize waste does not "express adequate standards" to guide BLM in the complexities of air quality regulations. *See id.* "[T]he MLA cannot be read to impose a mandate for BLM to require

lessees to use certain technologies." *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 937

F. Supp.2d 1140, 1160 (N.D. Cal. 2013). The later, more specific regulatory framework

established by the CAA trumps the general direction of the MLA. *See, e.g.*, *United States v.*

*Estate of Romani*, 523 U.S. 517, 532 (1998) (holding that canons of statutory construction

require that later, more specific statutes trump prior, general statutes).

Similarly, with respect to BLM's authority under Section 17 of the MLA to regulate

surface-disturbing activities, this section only authorizes BLM to regulate surface "disturbing"

activities and reclamation, not air quality effects. *See* 30 U.S.C. § 226(g). Accordingly, the

MLA does not authorize BLM to establish an air quality scheme applicable to oil and gas

development on the public lands.

4. <u>No Other Authority Cited by BLM Confers Authority to Establish a
Comprehensive Air Quality Regulatory Scheme</u>.

Although BLM cites in passing a smattering of statutes as authority to enact the Rule, it is

unable to cite any specific language or provisions in these statutes as support for the Rule. *See*

81 Fed. Reg. at 83,019–20. In fact, each of these statutes confers narrower authority than either

the MLA or FLPMA—neither of which authorize the Rule. The Mineral Leasing Act for

Acquired Lands simply authorizes BLM to lease lands acquired by the United States pursuant to

the terms of the MLA, with specific limitations. *See* 30 U.S.C. §§ 351–360; 1 Law of Federal

Oil and Gas Leases § 2.08. The Federal Oil and Gas Royalty Management Act (FOGRMA)

creates a comprehensive system for collecting federal mineral royalties, assigns liability for

royalty payments, requires security plans to prevent theft of oil and gas, requires inspection,

authorizes audit, and imposes civil and criminal penalties for non-compliance. *See* 30 U.S.C.

§§ 1701–1758. The Indian Mineral Leasing Act of 1938 (IMLA) authorizes BLM to lease

Indian lands owned by a tribe or group, sets forth the terms of such leases, and establishes

- 26 -

procedures for leasing, *see* 25 U.S.C. §§ 296a–g; 2 Law of Federal Oil and Gas Leases § 26.05; the Act of March 3, 1909 authorizes BLM to lease allotted Indian lands, *see* 25 U.S.C. § 396. The Indian Mineral Development Act of 1982 (IMDA) authorizes tribes to negotiate for a variety of leases, contracts, and agreements governing mineral development. 2 Law of Federal Oil and Gas Leases § 26.05; *see* 25 U.S.C. §§ 2101–2108. Neither the IMLA nor the IMDA "delegate[ ] any more specific authority over oil and gas drilling operations than the MLA." *Wyoming v. U.S. Dep't of the Interior*, Nos. 2:15-CV-043-SWS, 2:15-cv-041-SWS, 2016 WL 3509415, at *6 (D. Wyo. June 21, 2016). Fundamentally, these statutes, as well as FLPMA and the MLA, allow BLM to engage in a variety of activities but not air quality regulation. Accordingly, BLM has not identified any statutory authority for this Rule. Because Congress has not delegated any air quality management authority to BLM, the Rule must be set aside.[23]

B.     Even if the Rule is Within BLM's Authority, It Does Not Receive *Chevron* Deference.

This Court need not examine the Rule under *Chevron USA, Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), because Congress delegated no authority to BLM to issue the Rule. Even under *Chevron*, however, the Rule is entitled to no deference. *Chevron* directs courts to give "considerable weight" to an agency's interpretation of a statute it administers, unless the agency's interpretation is based on an impermissible construction of the statute or the agency failed to offer a "reasoned explanation" for departing from a prior interpretation of a statute. 467 U.S. at 844; *Encino Motorcars LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016). *Chevron* requires this Court to first determine whether Congress has "directly spoken to the

---

[23] While the remainder of the brief refers to the CAA in several instances, such references are in no way intended to waive Petitioners' fundamental argument that BLM lacks any congressionally delegated authority to regulate air quality.

precise question at issue." 467 U.S. at 842. If not, "the [C]ourt does not simply impose its own construction on the statute." *Id.* at 844. Instead, "if the statute is silent or ambiguous with respect to the specific issue," the Court must examine "whether the agency's answer is based on a permissible construction of the statute." *Id.* The Court cannot defer to an interpretation that is "arbitrary, capricious, or manifestly contrary to the statute." *Id.*

Here, the Rule does not receive *Chevron* deference because it does not permissibly construe BLM's waste management authority under the MLA, it impermissibly assesses royalty on gas that was historically considered "unavoidably lost," and improperly applies to nonfederal/non-Indian wells within a communitized area or unit.

     1.     The Rule is Not a Permissible Construction of BLM's Authority under the MLA to Manage Waste.

The Rule's definition "unavoidably lost" is inconsistent with the concept of "waste" under the MLA. Additionally, the Rule negates its stated purpose because it will increase rather than decrease waste. Finally, Section 3179.11 inappropriately relies on BLM's authority over waste to defer approvals of APDs and limit production.

     a)     The Rule's Definition of "Unavoidably Lost" is Inconsistent with the MLA.

Section 16 of the MLA requires that all oil and gas leases contain the condition that lessees use "reasonable precautions" to prevent waste. 30 U.S.C. § 225. Similarly, Section 30 of the MLA requires lessees to observe the Secretary's rules relating to "the prevention of undue waste." *Id.* § 187. The general concept of waste is fundamental to oil and gas regulation. *See* Bruce M. Kramer, "Pooling & Unitization: A Historical Perspective & An Introduction to Basic Vocabulary," *Federal Onshore Oil & Gas Pooling & Unitization*, Paper 1 (Rocky Mtn. Min. L. Fnd. 2014) (characterizing waste as a "bedrock" principle). Although Congress did not define "waste" in the MLA, "waste" is considered to be a "preventable loss [of oil and gas] the value of

which exceeds the cost of avoidance."  Howard R. Williams & Charles J. Meyers, *Manual of Oil and Gas Terms* 1135 (Patrick H. Martin & Bruce M. Kramer eds., 16th ed. 2015) (citing Stephen L. McDonald, *Petroleum Conservation in the United States, An Economic Analysis* 129 (1971)). BLM's regulatory definition of waste, which the Rule does not amend, defines "waste" as "any act or failure to act by the operator that is not sanctioned by [BLM] as necessary for proper development and production which results in (1) A reduction in the quality or quantity of oil and gas ultimately producible from a reservoir under prudent or proper operations; or (2) <u>avoidable</u> surface loss of oil or gas."  43 C.F.R. § 3160.0-5 (emphasis added).

DOI has never defined "waste" to include all lost oil or gas.  Since the 1920s, DOI has confined waste to situations where oil or gas was "avoidably" lost during production of oil and gas.  *See Marathon Oil Co. v. Andrus*, 452 F. Supp. 548, 551 (D. Wyo. 1978) ("For more than half a century, both the government, as lessor, and all of its lessees have understood and have been governed by the pertinent statutes to the end that all oil and gas used on the lease for ordinary production purposes or <u>unavoidably</u> lost were not subject to royalty payments to the government.") (emphasis added); *see also* NTL-4A § I; 43 C.F.R. § 3160.0-5 (2015); 47 Fed. Reg. 47,758, 47,766 (Oct. 27, 1982).  The definition of "avoidably lost" only identified four circumstances, including the lessee or operator's failure to "take all <u>reasonable</u> measures to prevent and/or control the loss" of produced gas.[24]  43 C.F.R. § 3160.0-5 (2015) (emphasis added)*;* 47 Fed. Reg. 47,758, 47,766 (Oct. 27, 1982); NTL-4A § II(A).  All other gas was

---

[24] These four circumstances included:  (1) an operator's negligence; (2) an operator's failure to take all reasonable measures to prevent and/or control the loss of gas; (3) an operator's failure to comply with lease terms, regulations, or BLM notices and orders; (4) or any combination thereof.  43 C.F.R. § 3160.0-5 (2015).

considered "unavoidably lost" and allowed under the MLA. Stated otherwise, BLM's prior regulations allowed it to excuse all loss of gas except in certain prescribed circumstances.

The Rule flips this framework and instead defines all lost gas as waste, except as specifically allowed. The Rule does not alter the definition of "waste" itself but instead revises the definitions of "avoidably" and "unavoidably" lost gas. 43 C.F.R. § 3179.4. The Rule defines "avoidably lost" gas as: (1) gas that is not "unavoidably lost"; (2) gas flared in excess of the gas capture requirements; and (3) waste oil due to operator negligence. 43 C.F.R. § 3179.4. The Rule then arbitrarily delineates twelve very specific circumstances where gas is "unavoidably lost." 43 C.F.R. § 3179.4(1)(i)-(xii). Unless lost gas falls into one of these twelve categories, it is automatically waste and royalty bearing. 43 C.F.R. § 3179.5(a). These revisions reverse decades of prior DOI interpretations and remove BLM's discretion to consider the specific circumstances surrounding lost gas, including whether an operator took "reasonable precautions" to prevent waste.

Whether an operator took "reasonable precautions" to prevent waste inherently depends on the economic feasibility of capturing gas. *See* Williams & Meyers, *supra* at 1135 (defining "waste" as a "preventable loss the value of which exceeds the cost of avoidance"); 43 C.F.R. § 3162.7 (requiring lessees to market hydrocarbons where economically feasible). A variety of circumstances exist in which the capture and marketing of gas is not economically feasible. For example, midstream gatherers usually require an operator to dedicate all of its gas to its gathering system, which services multiple operators and many wells. A well connected to a gathering system could be bumped off the system due to higher pressure from another operator coming online; although this occurrence would last only for a short time, the operator would not have control of the well that was bumped off the system and would be forced to flare its gas. "The

only way to avoid flaring at a location connected to a gas gathering system is to install a redundant gathering system," which may not be economically feasible or may be prohibited by a dedicated gas contract. API Comments at 59. The Rule, however, requires capture of gas without regard to economic feasibility.

Additionally, whether an operator took "reasonable precautions" to prevent waste inherently depends on whether or not the loss of oil or gas was the fault of the operator or could have been otherwise prevented by reasonably, prudent operations. The term "unavoidable" is defined as "not able to be prevented or avoided[.]" *Merriam-Webster's Collegiate Dictionary* 1284 (10th ed. 1997). Yet, the definition of "unavoidably lost" does not include numerous circumstances that would generally be considered "unavoidable." For example, if scheduled maintenance is performed on a gathering system operated by a third party, the well operator has no control over the maintenance and would be forced to flare. The Rule, however, does not consider scheduled maintenance by a third party to be an emergency and does not consider flared gas "unavoidably lost," even though the loss of gas is not preventable.[25] *See* 43 C.F.R. §§ 3179.4(1)(vi), 3179.105(b)(4); 81 Fed. Reg. at 83,048.

The Rule's failure to account for the economic feasibility of capture and an operator's reasonableness in the definitions of "avoidably lost" and "unavoidably lost" is flatly inconsistent with the MLA's directive that lessees use "reasonable precautions" to prevent waste. 30 U.S.C. § 225 (emphasis added). Instead, BLM has effectively imposed a zero waste standard without statutory authority. *Cf. Indust. Union Dep't, AFL-CIO v. API*, 448 U.S. 607, 613 (1980) (absent

---

[25] In the Rule's preamble, BLM suggests that any gas lost during scheduled maintenance is "avoidable" because an operator could, in theory, shut in the well during the maintenance event. *See* 81 Fed. Reg. at 83,048. Shutting in a well, however, is not always technically feasible and can damage the reservoir, resulting in underground waste. *See* Section III.B.1.b *infra*.

clear mandate, agency lacked authority to promulgate risk-free standards when regulation imposed standard of reasonably necessary or appropriate).  Therefore, the Rule's expansion of "waste" through the definition of "unavoidably lost" is an impermissible interpretation of the MLA and not entitled to *Chevron* deference.

b)    <u>The Rule Will Lead to More Waste through Premature Abandonment of Wells</u>.

The Rule also impermissibly interprets "waste" because, even if the Rule will reduce loss of gas occurring at the surface, it will lead to more subsurface waste.  Subsurface waste occurs when an oil and gas reservoir is developed in a manner that causes "reduction in the quantity of oil or gas ultimately recoverable from a pool under prudent and proper operations."  *See* 43 C.F.R. § 3160.0-5.  Subsurface waste can occur when a well is prematurely abandoned because, once abandoned, a well may not return to its former production, leaving the unproduced hydrocarbons beneath the surface.  *See* J. Howard Marshall & Norman L. Meyers, *Legal Planning of Petroleum Production*, 41 Yale L. J. 33, 66 n.124 (1931); *accord* Thomas P. Battle, *Lease Maintenance in the Face of Curtailed/Depressed Markets*, 32 Rocky Mtn. Min. L. Inst. § 14.05[4] (1986) (noting that premature abandonment of wells leads to waste).

The Rule will increase underground waste because exceptions to the subpart 3179 requirements can only be obtained when an operator or lessee can demonstrate that the requirements will cause abandonment of "<u>significant</u> recoverable oil reserves,"[26] although BLM declined to define "significant."[27]  *See* 43 C.F.R. §§ 3179.8(a) (alternative capture requirements); 3179.102(c) (well completions), 3179.201(b)(3) (pneumatic controllers), 3179.202(f),

---

[26] Abandonment is the permanent cessation of production from a well.

[27] A rule is arbitrary when the agency fails to adequately define key terms.  *Qwest Corp. v. Fed. Commc'ns Comm'n*, 258 F.3d 1191, 1201 (10th Cir. 2001).

3179.203(c)(e), 3179.303(c) (emphasis added).  Thus, the Rule will result in the premature abandonment of reserves that are not considered "significant," resulting in underground waste. Moreover, the Rule does not allow BLM to compare the amount of gas that would be captured to the amount left undeveloped.  In contrast, NTL-4A allowed venting or flaring upon a demonstration that "conservation of the gas, if required, would lead to the <u>premature</u> abandonment of recoverable oil reserves and ultimately to a <u>greater loss</u> of equivalent energy than would be recovered if the venting or flaring were permitted to continue."  NTL-4A § IV(B) (emphasis added).

Even if wells will not be abandoned, adherence to the requirements of subpart 3179 will cause the operator to "shut-in" (i.e., temporary cease) production.  BLM expressly recognizes it may require operators to shut in wells for months or years rather than granting an exception to the requirements of subpart 3179.  *See* 81 Fed. Reg. at 83,052.  Repeatedly shutting in a well can reduce its productivity, thus leading to underground waste.[28]  *See* API Comments at 60–61 ("[t]he damage from repeat shut ins is irreversible and permanent, and is likely to lead to lower ultimate recovery and increased waste, which are contrary to the objective of BLM and the [ ] Rule").  Remarkably, BLM does not analyze or even consider whether the Rule will cause more underground waste of gas than the amount of gas that will be captured at the surface.  The Rule's interpretation of "waste" is impermissible and therefore receives no *Chevron* deference.

    c)    <u>Section 3179.11 Inappropriately Relies on BLM's Authority Over Waste to Defer Approvals of APDs and Limit Production</u>.

Finally, Section 3179.11 improperly interprets BLM's authority under the MLA to manage for waste.  This section allows BLM to require operators to "limit the production level"

---

[28] Moreover, shutting in a well does not involve simply flipping a switch.  Rather, it requires resources and manpower, often mobilized to remote locations.  *See* API Comments at 60–61.

from a new oil well recently connected to a gas pipeline if the new production will force wells off the pipeline.  43 C.F.R. § 3179.11(a).  BLM, however, ignores that pipeline capacity is the primary reason operators flare.  *See* U.S. Gov't Accountability Office, GAO-16-607, *Oil and Gas: Interior Could Do More to Account for and Manage Natural Gas Emissions* (2016).[29] BLM's assertion that it can limit production arbitrarily presumes it possesses the physical ability and legal authority to ensure universal access to pipelines.  BLM provides no evidence it is even possible to manipulate well pressures across complex, interconnected systems to ensure all lessees connected to a pipeline can utilize it.  Similarly, BLM ignores that pipeline capacity is affected by nonfederal wells connected to the pipeline, which are not subject to BLM orders.  Accordingly, Section 3179.11 is arbitrary.

Additionally, if gas capture capacity is not available on a given lease, Section 3179.11 allows BLM to delay approval of an APD, to condition approval of the APD with requirements for gas capture or limitations on production, or to suspend the lease if it is not yet producing.  43 C.F.R. § 3179.11(b).  BLM, however, lacks authority to delay approval of an APD because gas capture capacity is unavailable.  Congress has directed that BLM approve APDs within 30 days of receiving a complete APD package if BLM has satisfied its procedural obligations under environmental laws.  30 U.S.C. § 226(p)(2)(A).  BLM may defer issuance of a permit only if it provides the applicant with notice of the "steps the applicant could take for the permit to be issued" or a list of actions the agency must take to comply with applicable law.  *Id.* § 226(p)(2)B)(ii).  Because gas capture capacity is beyond an operator's control, BLM cannot defer an APD on this ground.  Similarly, BLM cannot evade Congress' 30-day direction by

---

[29] *Available at* http://www.gao.gov/assets/680/678285.pdf.

issuing an APD conditioning production startup on available gas capture capacity.  Therefore, Section 3179.11 exceeds BLM's authority and is not entitled to deference.

2. <u>The Rule's Assessment of Royalty on All Unavoidably Lost Production is Not Entitled to Deference.</u>

The Rule improperly expands a lessee's royalty obligations by assessing royalty on all oil and gas that historically was considered "unavoidably lost."  *See* 43 C.F.R. §§ 3179.4 (definition of "avoidably lost"), 3179.5.  The Rule characterizes gas flared in excess of the gas capture requirements in Section 3179.7 as "avoidably lost" regardless of the circumstances that led to the additional flaring and regardless of an operator's caution and reasonableness.

Both Congress and the courts have rejected prior attempts by DOI to assess royalty on unavoidably lost production.  During the first 50 years of the MLA, DOI had never assessed royalty on unavoidably lost gas, including gas used in venting or flaring.  *See* 30 C.F.R. § 221.35 (1938); *Marathon Oil Co. v. Andrus*, 452 F. Supp. 548, 551 (D. Wyo. 1978); 52 Fed. Reg. 3796, 3797 (Feb. 6, 1987) (describing history of provision); 51 Pub. Lands Dec. 283 (1925).  In 1974, DOI controversially changed this practice and attempted to assess royalty on the value of all production from onshore federal oil and gas leases.  *See* NTL-4 (Dec. 1, 1974).

The *Marathon* court specifically rejected BLM's attempt as arbitrary and capricious.  The court explained that the Secretary's prior interpretation of the MLA is so fundamental to operations on federal oil and gas leases that the Secretary lacks the authority to substantially narrow it.  *Marathon*, 452 F. Supp. at 551–53  (reasoning that the Secretary's prior interpretations of the MLA "affect substantial rights in and under federal gas leases, which have held to be interests in real property").  Moreover, the court viewed the Secretary's newfound interpretation of the MLA with skepticism, stating that when an agency "gives a construction to a [statute] and acts upon that construction for many years, the Court looks with disfavor upon a

change whereby parties who have contracted in good faith under the old construction may be injured by a different interpretation." *Id.* at 551; *cf. Gulf Oil Corp.*, 460 F. Supp. 15 (1978) (rejecting NTL-4 because it would assess royalty on total production from a well). Following the *Marathon* case and other cases rejecting NTL-4, it was subsequently withdrawn and replaced with NTL-4A. *See Texaco, Inc.*, 135 IBLA 112, 113 (1996). In the Rule's preamble, however, BLM disregards the holding of *Marathon*, asserting that "BLM's past practice does not prohibit it from revising its interpretation" of avoidably lost. 81 Fed. Reg. at 83,083.

In 1982, Congress further circumscribed DOI's authority to assess royalty on unavoidably lost gas through FOGRMA. Section 308 of that act clarified that lessees are only liable for royalty on lost or wasted gas when the lost or waste is "due to negligence" by the operator or "due to the failure to comply with any rule or regulation, order or citation issued under [FOGRMA] or any mineral leasing law." 30 U.S.C. § 1756. Because the Rule assesses royalty on a variety of circumstances that result in lost or wasted gas for reasons other than negligence, such as an operator's inability to meet the gas capture requirements, and on lost or wasted gas that historically has been considered "unavoidably lost," BLM's interpretation of "unavoidably lost" is not entitled to deference.

Finally, the Rule must be set aside because it requires payment of royalty on flared gas BLM has determined is unavoidably lost. The Rule provides that royalty is due on "excess flared gas," which the Rule essentially defines as gas flared in excess of the capture targets. *See* 43 C.F.R. § 3179.5(d). The definition of "excess flared gas," however, does not except or exclude flared gas that falls within one of the twelve defined categories of "unavoidably lost" gas. *See id.* As a result, even if gas is deemed unavoidably lost and thus not subject to royalty, *see* 43 C.F.R. §§ 3179.4, 3179.5(b), royalty will be assessed if the unavoidably lost gas exceeds

the capture targets.  Because the Rule requires payment of royalty BLM has deemed unavoidably lost, the Rule is arbitrary and must be set aside.

        3.      <u>BLM Lacks Authority to Apply Subpart 3179 to Nonfederal Wells Within a Communitized Area or Units</u>.

The Rule improperly applies the waste prevention requirements in subpart 3179 to nonfederal and non-Indian wells within communitized areas and units.  Communitization agreements and units must include at least one federal or Indian lease but may also include leases that are neither federal nor Indian.  *See* 30 U.S.C. § 226(m).  To encourage the efficient development of leases, production from any lease within a communitized area or unit will be treated as production occurring on all of the communitized or unitized leases.  *See* Kemp J. Wilson & John R. Lee, "Unitization & Communitization Issues," *Federal Drainage Protection & Compensatory Royalties*, Paper 8, § 8.02[A][1], [2] (Rocky Mtn. Min. L. Fnd. 1994).  Production is apportioned to each lease based on its relative size.  *See id.*

Historically, BLM has not regulated wells within a communitized area or unit if the well does not physically penetrate a federal lease.  For such wells, BLM only ensures the security, proper accounting, and proper payment of royalties on production of federal oil and gas through its authority under FOGRMA.  43 C.F.R. § 3161.1(b) (2015); *see generally* 30 U.S.C. § 1702(9) (defining "oil and gas" as oil and gas "allocated to" federal or Indian lands for inspection and accounting of federal production).

The Rule dramatically departs from BLM's limited oversight of nonfederal wells in units and communitized areas by subjecting such wells to the air quality requirements set forth in subpart 3179.  *See* 43 C.F.R. § 3179.2(a)(4).  The MLA grants BLM no authority to regulate operations on nonfederal leases within a unit or communitized area.  *See* 30 U.S.C. § 225(m).  Likewise, because FOGRMA only allows BLM to ensure that federal and Indian oil and gas is

"property accounted for," BLM's oversight of production of oil and gas allocated to federal and Indian leases is limited to site security, measurement, and reporting. *See* Pub. L. No. 97-451, 96 Stat. 2447, 2447 (1983).

The application of subpart 3179 to nonfederal wells within units and communitized areas results in duplicative regulation of these wells. States have primacy over regulation of waste on nonfederal leases. *See, e.g.*, Wyo. Stat. § 30-5-104 (describing powers of Wyoming Oil and Gas Conservation Commission). Furthermore, because states, together with EPA, have exclusive jurisdiction over air quality regulation on these facilities, a well within a unit or communitization agreement may be subject to three different air quality control regimes (e.g., state requirements, EPA requirements such as the Quad Oa regulations, and now BLM requirements).

More troubling, the application of subpart 3179 to nonfederal and non-Indian wells within communitization areas and units will reduce revenue to private mineral owners, state mineral owners, and the states generally through reduced tax revenue. Of the gas flared from wells developing federal and Indian leases, BLM estimates that 45 percent of it is attributable to nonfederal and non-Indian leases. RIA at 16. Despite these significant nonfederal interests, BLM contemplates that operators will regularly shut in wells—possible for as long as two years—when the requirements of subpart 3179 cannot be met. *See* 81 Fed. Reg. at 83,052. During this time, lessees and lessors with interests in nonfederal/non-Indian wells will be deprived of any revenue from shut in wells. Furthermore, the Rule applies to units and communitization areas no matter how insignificant the federal or Indian mineral interest,[30] the

---

[30] Federal mineral interests generally make up at least ten percent of units, but communitized areas can have minimal federal interests. *See* 43 C.F.R. § 3181.1 (2015); BLM Manual 3160-9 – Communitization §§ .06–.11(A) (Rel. 3-215 July 7, 1988), *available at*

amount of federal or Indian gas that would be lost, or the relative cost of compliance with the

Rule *vis a vis* the revenue saved the United States. *See* Section III.B.1.a, *supra* (definition of

"waste").

BLM, however, entirely disregarded these concerns, asserting only that the Rule would

have "incidental impacts" on nonfederal minerals communitized or unitized with federal or

Indian leases. 81 Fed. Reg. at 83,039. BLM's characterization ignores the significant nonfederal

and non-Indian interests that will be affected by the Rule. *See* RIA at 16. Furthermore, even

though at least one state expressed concerns regarding the Rule's economic impacts to state

treasuries and private citizens,[31] BLM failed to analyze the Rule's economic impacts on

nonfederal and non-Indian leases. *See generally* RIA. Accordingly, BLM's assertion that the

Rule will have "incidental impacts" lacks any basis and ignores the Rule's material effect on

nonfederal and non-Indian interests. Therefore, the Rule does not receive any deference under

*Chevron* and must be set aside.

 C. The Rule is Unlawful and Must Be Set Aside under the Administrative Procedure
   Act, 5 U.S.C. § 706.

Notwithstanding BLM's lack and exceedance of its statutory authority, the Rule must be

set aside because it is arbitrary and capricious, an abuse of discretion, and otherwise not in

accordance with law. *See* U.S.C. § 706(2)(A). The court must "engage in a substantive review

---

https://www.blm.gov/style/medialib/blm/mt/blm_programs/energy/oil_and_gas/reservoir_manag
ement/communitization.Par.10316.File.dat/3160-9Man.pdf.

[31] The New Mexico Oil Conservation Division explained that "the Proposed Rule will certainly
lead to the premature plugging and abandonment of many wells, reduce state and federal
revenues and thereby significantly reduce money available to pay teachers and fund
infrastructure projects, devastate New Mexico's economy, and leave the state with countless
environmental liabilities with which it will be unable to financially address." New Mexico Oil
Conservation Division Comments 6–7 (April 22, 2016), *available at* www.regulations.gov,
BLM-2016-0001-9055.

of the record to determine if the agency considered relevant factors and articulated a reasoned basis for its conclusions."[32] *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994); *see also Wyoming v. United States*, 279 F.3d 1214, 1238 (10th Cir. 2002) (citation omitted) (the reviewing court should conduct a "thorough, probing, in-depth review"). To survive review, the agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation and citation omitted). Courts will set aside agency action "as arbitrary unless it is supported by 'substantial evidence' in the administrative record."[33] *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004) (citing *Olenhouse*, 42 F.3d at 1575). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (quotation omitted).

The Rule is arbitrary and capricious for several reasons. BLM has not adequately identified or defined the problem the Rule seeks to address. The Rule's requirement that operators prepare waste minimization plans for new wells to be drilled compels disclosure of confidential, proprietary, and competitive information. Finally, the Rule's cost-benefit analysis is fundamentally flawed.

---

[32] Although often treated as two separate doctrines, the Supreme Court has indicated that, in a practical sense, arbitrary and capricious review and the second step of the *Chevron* analysis involve "the same" inquiry. *See Judulang v. Holder*, 132 S. Ct. 476, 484 n.7 (2011).

[33] *See Black Butte Coal Co. v. United States*, 38 F. Supp.2d 963, 969 (D. Wyo. 1999) (discussing the Tenth Circuit's approach to reviewing formal and informal agency action and noting that there is no "substantive difference between what is required by the substantial evidence test [and the arbitrary and capricious test]") (citations omitted).

1.    The Rule is Arbitrary and Capricious because BLM Has Not Adequately Identified or Defined the Problem It Seeks to Address.

BLM fails to clearly define the problem it purports to solve, particularly with respect to subpart 3179, and its explanations for the Rule's purpose lack a rational connection between the administrative record and the agency's regulatory choices. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The reality is because of technology advances, voluntary efforts, and regulation both methane emissions and flaring levels continue to decline despite significant growth in production.[34]

Furthermore, if the Rule truly intends to combat waste, it fails to do so in any meaningful way, which is best exemplified by the *de minimis* royalty value of the "waste" BLM seeks prevent. BLM estimates that volumes of gas "wasted" prior to the Rule in 2014 had a royalty value of $56 million. RIA at 3. The GAO, however, has determined that only 40 percent of "wasted" gas can be economically captured and sold using currently available technology. *See* U.S. Gov't Accountability Office, GAO-11-34, *Federal Oil and Gas Leases:  Opportunities Exist to Capture Vented and Flared Natural Gas, Which Would Increase Royalty Payments and Reduce Greenhouse Gases*, 2 (Oct. 2010).[35] Thus, BLM can only realize up to $22.4 million in annual royalty revenue from this Rule.

---

[34] For example, "the volume of North Dakota's natural gas production that is flared has fallen sharply in both absolute and percentage terms since 2014.  In March 2016, 10% of North Dakota's total natural gas production was flared, less than one-third of the January 2014 flaring rate, which was at 36%.  Flaring rates and volumes have significantly decreased as North Dakota's total natural gas production has continued to grow, setting a monthly total natural gas production record of 1.71 billion cubic feet per day in March 2016."  U.S. Energy Information Admin., *Natural Gas Flaring in North Dakota has Declined Sharply Since 2014* (June 13, 2016), http://www.eia.gov/todayinenergy/detail.php?id=26632&src=email.

[35] *Available at* http://www.gao.gov/new.items/d1134.pdf.

In comparison, BLM estimates the total production of oil and gas from onshore federal and Indian in Fiscal Year 2015 generated over $2.3 billion in royalties. *See* 81 Fed. Reg. at 83,009. Therefore, the estimated royalty value of the "wasted" gas recovered amounts to 0.97 percent of the total royalty generated from onshore and offshore federal and Indian oil and gas production in Fiscal Year 2015. [36] BLM provides no satisfactory explanation for why or how this *de minimis* amount of "waste" justifies the Rule, which carries up to $279 million per year in compliance costs. [37] *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions"); *see also Rocky Mountain Helicopters, Inc. v. F.A.A.*, 975 F.2d 736, 737 (10th Cir. 1992) (finding agency action arbitrary and capricious where "examination of the record" did not contain a "satisfactory explanation" for the agency's action).

Additionally, if the Rule is viewed from the perspective of air quality benefits, BLM again fails to provide any reasonable justification. The purported emissions benefits of the Rule are virtually zero. Using BLM's most ambitious reduction numbers, it estimates global methane emissions will be reduced by a mere 0.061 percent. Moreover, methane emissions are only one component of total global GHG emissions. In this context, the Rule would deliver a mere 0.0092 percent reduction of total global GHG emissions. *See e.g., Wash. Envtl. Council v. Bellon*, 732

---

[36] Moreover, the value of gas has declined. On November 14, 2016, the market value for natural gas was $2.33 per Mcf. *See* U.S. Energy Info. Admin., *Henry Hub Natural Gas Spot Price* (last updated Nov. 16, 2016), http://www.eia.gov/dnav/ng/hist/rngwhhdD.htm. So even these *de minimis* estimates are overstated.

[37] This is to say nothing of potential enforcement costs, which are likely to be significant given the expansive scope and new requirements under the Rule.

F.3d 1131, 1145 (9th Cir. 2013) (striking Plaintiff's arguments that "any and all contribution of greenhouse gases must be curbed").[38]

Yet, BLM justifies the Rule overwhelmingly in terms of global climate change benefits. The near lack of any air quality benefit illuminates the absurdity of this Rule in air quality terms and demonstrates a total lack of reasoned decision-making. *See Judulang v. Holder*, 132 S. Ct. 476, 484 (2011). The Rule cannot survive judicial review because the administrative record does not support, substantially or otherwise, BLM's claims of air quality or climate change benefits.

In sum, the reviewing court's task "involves examining the reasons for agency decisions—or as the case may be, the absence of such reasons." *Judulang*, 132 S. Ct. at 484 (internal citation omitted) (finding that the agency "failed to exercise its discretion in a reasoned manner" and therefore "flunked [the arbitrary and capricious] test"). The Court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Viewed through either lens—"waste prevention" or "air quality"—BLM's rationale for this Rule flunks the arbitrary and capricious test.

2.    The Requirement to Prepare a Waste Minimization Plan Arbitrarily Compels Disclosure of Confidential, Proprietary, and Competitive Information.

The Rule's requirement that operators submit waste minimization plans with permits to drill new wells is arbitrary and capricious because it compels disclosure of confidential, proprietary, and competitive information with any rational basis. Section 3162.3-1 of the Rule requires operators to prepare and submit with an APD a plan to minimize natural gas waste.

---

[38] This figure compares EPA's 2010 estimated global GHG emissions of approximately 45,863 million metric tons of CO2-eq. with BLM's estimate of a 4.2 million metric ton reduction that will result from the Rule. *See* U.S. Envtl. Prot. Agency, *Climate Change Indicators: Global Greenhouse Gas Emissions* (Aug. 11, 2016), https://www.epa.gov/climate-indicators/climate-change-indicators-global-greenhouse-gas-emissions.

Waste minimization plans must contain confidential, propriety, and competitive information about anticipated production from the proposed well, including expected oil and gas production rates from the well, the expected production decline curve of oil and gas from the well, and the expected Btu value for gas production from the proposed well.  43 C.F.R. § 3162.3-1(j)(5)(i)–(iv); *see* API Comments at 29 (explaining the sensitive nature of this information).  BLM, however, offers no explanation of why it requires this information or how it will assist with the agency's decisionmaking.  *See* 81 Fed. Reg. at 83,042.  Rather, BLM explains that waste minimization plans are intended to assist operators, not the agency, stating the purpose of such plans "is for the operator to set forth a strategy for how the operator will comply with the requirements of subpart 3179[.]"  *See id.* (emphasis added).  Moreover, BLM offers no guarantee that this information will be protected from disclosure.  *See id.* at 83,043 (stating that plans will be posted "subject to any protections for confidential business information").  Because BLM fails to explain why the confidential information required in waste minimization plans will assist with its decisionmaking, this requirement is arbitrary and capricious.

3. <u>The Rule's Cost-Benefit Methodologies and Conclusions are Unreasonable.</u>

The methodologies and assumptions BLM used to estimate the costs and benefits, and ultimately justify the Rule, are so numerous and flawed that the Rule is unreasonable and should be set aside.  "When an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining the analysis can render the rule unreasonable."  *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012) (cost benefit analysis ultimately upheld following concession of the issue at oral argument); *see also Owner–Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 206 (D.C. Cir.

2007) (vacating regulatory provisions because the supporting cost-benefit analysis was based on an unexplained methodology).

Here, BLM concluded the benefits of the Rule "significantly" outweighed its costs. *See, e.g.*, 81 Fed. Reg. at 83,013 ("Overall, the BLM estimates that the benefits of this rule outweigh its costs by a significant margin"); *see also* BLM's *Fact Sheet on Methane and Waste Reduction Rule* (Nov. 15, 2016) at 2 ("Using conservative assumptions, the BLM estimates that the rule's net benefits could range from $46 to $204 million per year.").[39] As noted in numerous comments, however, the Rule actually is likely to create a <u>net loss</u>.[40]

One significant flaw is BLM's use of an inflated natural gas price. BLM used a price of $4 per Mcf to calculate the estimated savings from the Rule. RIA at 4. As of November 14, 2016, however, the Henry Hub spot price was $2.33 per Mcf, and the spot price has been consistently below $4 per Mcf since July 2014. *See* U.S. Energy Info. Admin, *Henry Hub Natural Gas Spot Price*, *supra*. Given that BLM justifies the rule on projected cost savings to the industry ($20–$157 million per year), this is a fatal flaw in the analysis. Moreover, the nearly eight-fold disparity in potential savings range ($20–$157 million per year) instills little confidence in BLM's assessment.

The Rule also fails to account for the economic impacts of the totality of BLM's rulemakings directed toward development of oil and natural gas on federal and Indian leases. Three significant updates to BLM's oil and gas regulations were published in the Federal Register the day before this Rule was published. *See* 81 Fed. Reg. 81,356, 81,462, 81,516 (Nov.

---

[39]https://www.blm.gov/sites/blm.gov/files/documents/files/oilandgas_WastePreventionRuleFactsheetFinal.pdf.

[40] *See, e.g.*, Joint Trades Comments at 22, 24–25; *see also* Devon Energy Corp. Comments 6 (April 19, 2016), BLM-2016-0001-0515; ConocoPhillips Comments 6 (April 22, 2016), BLM-2016-0001-8171; API Comments at ES-3.

17, 2016) (updating BLM Onshore Orders 3, 4, and 5). To accurately assess the economic impact of BLM's regulatory policies, including this Rule, the aggregate projected costs of those policies should be considered. The Rule fails to make this assessment.

Further, the Rule only results in a "net benefit" if the Social Cost of Methane (SCM) is used to estimate global climate change benefits from methane reductions. *See* RIA at 5–6 (monetizing benefits using the SCM). Using SCM runs counter to sound economic and good government principles because it compares costs born only by domestic producers with benefits extrapolated to the rest of the world. This generates no meaningful metric by which to determine whether this policy choice makes sense here in this country. Further, if it is air quality improvements from domestic industry that BLM seeks, the CAA's directive is clear: "protect and enhance the quality of the <u>Nation's</u> air resources so as to promote the public health and welfare and the productive capacity of <u>its population</u>." 42 U.S.C. § 7410(b)(1) (emphasis added). At a minimum, BLM should isolate the domestic-only benefits to ensure that the policy choices being made are achieving the outcomes desired and required by statute.

Second, the concept of SCM is not a well-recognized or accepted economic model—certainly not one that should form the cornerstone of this (or any other) rule. The bottom line is that without monetizing global climate change benefits using the SCM, the costs of the Rule vastly outweigh the benefits. These and other flaws with the cost benefit analysis render the Rule unreasonable, not supported by the record, and arbitrary and capricious.

     D.     <u>BLM Must Provide the Public with an Additional Opportunity to Comment on the Revised Rule</u>.

BLM is required to provide the public with an additional opportunity to comment on the Rule because the complex gas capture requirements were not in the proposed rule. The APA "requires an agency conducting notice-and-comment rulemaking to publish in its notice of

proposed rulemaking 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.'" *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007) (quoting 5 U.S.C. § 553(b)(3)). This mandate is "interpreted [ ] to mean that the final rule the agency adopts must be a 'logical outgrowth' of the rule proposed." *Id.* (citations omitted). A final rule is considered a "logical outgrowth" of a proposed rule if an additional "round of notice and comment would not provide commenters with their first occasion to offer new and different criticisms which the agency might find convincing." *Ass'n of Battery Recyclers, Inc. v. U.S. EPA*, 208 F.3d 1047 (D.C. Cir. 2000) (citing 5 U.S.C. § 553(b)(3)).

BLM's decision to introduce the gas capture requirements in Section 3179.7 requires additional public comment. Originally, the proposed rule set forth hard limits on the volume of gas that could be flared from a lease, unit, or communitized area over a period of three years. *See* 81 Fed. Reg. at 6,682 (43 C.F.R. § 3179.6). In the final Rule, BLM replaced these limits with complex requirements that operators capture certain percentages of the gas produced within a given area, ranging from a leasehold area to a state-wide area. *See id.* § 3197.7(b), (c)(3). These gas capture requirements are so dramatically different from the limits in the proposed rule that even BLM acknowledged they are a "major change" and a "significant difference[ ]." *See* 81 Fed. Reg. at 83,022, 83,025.

The public lacked notice of the drastically different approach BLM took to curb flaring and, as a result, the APA requires that BLM allow the public to comment on the gas capture requirements. They present practical compliance challenges for operators that warrant additional comment. For example, the Rule is ambiguous regarding how operators must pay royalty on any gas flared in excess of the capture requirements. *See* 43 C.F.R. §§ 3719.4, 3179.5, 3179.7(d). Because gas volumes are averaged over multiple leases, *see* 43 C.F.R. § 3179.7, the excess flared

gas cannot be attributed to a single lease.  Operators, however, are required to pay royalties on a

lease basis, *see* 30 C.F.R. § 1202.100(c) (2015), thus raising the question of how they must

allocate the additional royalty for the purpose of royalty payment.  This type of practical concern

can delay timely and accurate payment of royalty and, moreover, demonstrates why BLM should

have solicited additional public comment prior to finalizing the Rule.  Therefore, BLM cannot

implement the Rule without providing another opportunity for public comment.

IV.    **COMPLIANCE WITH THE RULE WILL IRREPARABLY HARM PETITIONERS**.

Petitioners will be irreparably harmed absent an injunction.  To demonstrate irreparable

harm, a petitioner "seeking preliminary relief [must] demonstrate that irreparable injury is <u>likely</u>

in the absence of an injunction."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)

(emphasis in original).  The movant must show "a significant risk that he or she will experience

harm that cannot be compensated after the fact by monetary damages."  *RoDa Drilling Co. v.

Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*,

321 F.3d 1250, 1258 (10th Cir. 2003)).  While economic loss alone is generally insufficient,

"imposition of money damages that cannot later be recovered for reasons such as sovereign

immunity constitutes irreparable injury."  *Crowe Dunleavy, P.C. v. Stidham*, 640 F.3d 1140,

1157 (10th Cir. 2011) (internal citations omitted).  "Where a plaintiff cannot recover damages

from the defendant due to the defendant's sovereign immunity, any economic loss suffered by a

plaintiff is irreparable *per se*."  *Air Conditioning, Heating & Refrigeration Inst. v. City of

Albuquerque*, No. CIV. 08-633MV/RLP, 2008 WL 5586316, at *5 (D.N.M. Oct. 3, 2008)

(citations omitted).  Finally, the court must determine "whether such harm is likely to occur

before the district court rules on the merits."  *RoDa Drilling Co.*, 552 F.3d at 1210 (citation

omitted).  Here, irreparable harm will occur in the absence of a preliminary injunction.  The Rule

will injure Petitioners' members through: (1) costs of compliance; (2) disclosure of proprietary, confidential, and competitive information; (3) payment of royalties on gas BLM has characterized as "avoidably lost."

If the Rule takes effect, Petitioners' members must immediately begin to expend capital to come into compliance. Several examples include: operators must make determinations about storage vessel applicability within 60 days of the effective date, and if applicable, will incur potentially significant retrofit costs, *see* 43 C.F.R. § 3179.203; royalties will be due effective immediately on avoidably lost oil and gas, including for oil and gas not considered "unavoidably lost" under Section 3179.4; for all wells, before the operator manually purges a well for the first time after January 17, 2017, the operator must document technical infeasibility or undue cost in a Sundry Notice, *see* 81 Fed. Reg. at 83,062. BLM also expects that the "requirements to replace existing equipment would necessitate <u>immediate</u> expenditures."[41] RIA at 4 (emphasis added). More generally, because the Rule so fundamentally changes BLM's venting and flaring regulatory program (e.g., LDAR, gas capture plans, royalty bearing activities) operators must begin planning for implementation immediately, and will incur expenses in doing so.[42] Because BLM generally enjoys sovereign immunity, Petitioners cannot recover monetary damages from the agency. *Cf. Ohio Oil Co. v. Conway*, 279 U.S. 813 (1929) (finding irreparable harm when state tax law did not provide for refund of payment).

There are undoubtedly significant compliance costs attached to the Rule. *See* RIA at 127. BLM estimates the Rule will impose annual costs ranging between $42,300 and $65,800 per

---

[41] *See* Joint Trades Comments at 9, tbl. 1, app. A (estimating the replacement of pneumatic controllers to cost $384 per well, replacement of pneumatic pumps to cost $307.69 per well, and LDAR to cost $3,736 per well).

[42] *See* Declaration of Kathleen M. Sgamma, *attached hereto* as Exhibit 5 *and* Declarat

operator depending on the discount rate used. *Id.* at 129. In the aggregate, BLM estimates the Rule will cost between $100 and $279 million per year, depending on the discount rate used to annualize capital costs. *Id.* at 4. The Rule will cause additional financial injury if operators are forced to shut in leases because continued production becomes uneconomical under the Rule. *See* API Comments at 6 (estimating that up to 325 leases "could be at risk of shut-in production").

Although multiple commenters indicate that BLM has underestimated these compliance costs, *see, e.g.*, Independent Petroleum Association of America, Western Energy Alliance, American Exploration and Production Council, and U.S. Oil and Gas Association Joint Comments 46 (April 22, 2016) ("Joint Trades Comments") ("BLM substantially underestimates the cost of replacing pneumatic controllers"), the Court need not resolve the issue of whether BLM's estimate is accurate. The Court of Appeals has found a likelihood of irreparable harm where the members of a trade association alleged an annual cost of $1,000 or more per company to comply with a new law when the compliance costs could not be recovered due to sovereign immunity. *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 756, 770–71 (10th Cir. 2010); *see also Direct Mktg. Ass'n v. Huber*, No. 10-CV-001546, 2011 WL 250556, at **6–7 (D. Colo. Jan. 26, 2011) (granting injunctive relief because a trade association's members would spend $3,100 to $7,000 per company to comply with new state requirements). Therefore, the Court may enjoin BLM from implementing the Rule on this basis alone.

The Rule also will cause irreparable harm because it requires Petitioners' members to provide to BLM information they consider proprietary, confidential, and competitive without assurances BLM can protect this information from disclosure. *See Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986) (affirming finding of irreparable harm where private third

parties possessed confidential information concerning petitioner's "engineering failures and successes, financial performance and projections, and marketing plans"); *Wells Fargo Bank, N.A. v. Clark,* No. CIV. 11-6248-TC, 2011 WL 3715116, at *3 (D. Ore. Aug. 23, 2011) (finding irreparable harm if petitioner was forced to disclose trade secrets). Here, Section 3162.3-1(j)(2) requires operators to disclose confidential business information in the waste minimization plan that must accompany an APD, including anticipated production from a proposed well, the expected production decline curve of oil and gas from the well, and the expected Btu value for gas production from the proposed well. 43 C.F.R. § 3162.3-1(j)(5)(i)–(iv). Operators consider this information highly confidential, particularly in exploratory areas with little existing production where operators stand to lose a competitive advantage when attempting to develop a new resource. *See, e.g.*, API Comments at 28 ("production decline curve data would reveal well reserves that are also confidential business information and irrelevant to the determination of pipeline capacity at the time of initial connection").

Compliance with the Rule risks disclosure of this competitive information. BLM has not assured operators this information will be withheld from disclosure. Rather, in response to a public comment requesting disclosure of waste minimization plans, BLM stated it <u>would</u> post each waste minimization plan for public review, "subject to <u>any</u> protections for confidential business information." 81 Fed. Reg. at 83,043 (emphasis added); *see* Onshore Oil and Gas Order No. 1, § III.E.1, 72 Fed. Reg. 10,308, 10,333–34 (Mar. 7, 2007) (requiring that APDs be posted for public review). Although the Freedom of Information Act (FOIA) protects the disclosure of both competitive business information and geological data, *see* 5 U.S.C. § (b)(4), (9), BLM declined to confirm the information in waste minimization plans was subject to any statutory protections. *See* 81 Fed. Reg. at 83,051 (stating only that "BLM will handle the information in

accordance with" its FOIA regulations).  Because the Rule requires operators to risk disclosure of confidential business information, operators have demonstrated a significant risk of irreparable harm.

In sum, injunctive relief is necessary to prevent irreparable harm to Petitioners' members. Neither the cost of compliance nor the disclosure of confidential or competitive information can be remedied through the recovery of money damages.  *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 200–21 (1994) (Scalia, J., concurring in part) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs."); *PepsiCo, Inc. v. Redmond*, No. 94 C 6838, 1996 WL 3965, at *29 (N.D.Ill. Jan. 2, 1996) (collecting cases) ("In cases such as this, involving threats to trade secrets <u>and </u>confidential information, courts readily presume irreparable injury from a showing that the protectable interest at stake is imperiled by a defendant's conduct") (emphasis added).

## V.        <u>THE EQUITIES WEIGH IN FAVOR OF AN INJUNCTION</u>.

The equities favor an injunction.  For the reasons detailed in Section IV, *supra*, Petitioners' interests will be irreparably harmed absent an injunction.  In contrast, the issuance of an injunction poses no threat to BLM's interests and it has not shown a compelling need to implement the Rule immediately.

There are no meaningful environmental or administrative benefits to be gained in immediately implementing the Rule.  The air quality benefits the Rule purports to achieve are virtually zero, whether those are achieved starting January 17, 2017 or following a ruling on the merits (if upheld).  Moreover, EPA and the states already have regulations in place controlling much of the emissions from the same facilities BLM seeks to regulate here.  In short, a delay in Rule implementation by a few months will not injure BLM.

Not only will the final Rule impose substantial costs on a broad range of oil and gas industry participants, it will impose considerable costs on BLM itself. *See* RIA at 86 (estimating that the Rule will cost BLM $1.35 million per year); *see also* 81 Fed. Reg. at 83,041; RIA at 100–02. BLM does not have the expertise to implement air quality regulations and lacks staffing and funding to administer this new regulatory regime. S*ee, e.g.* API Comments at 28; State of New Mexico's Oil Conservation Division Comments at 3. BLM fails to articulate how the agency will meet its significantly increased administrative responsibilities and offers no detail as to how it will prevent unnecessary operational delays and costs. Additional time is needed to allow BLM to address these concerns, and has become even more necessary with BLM's rush to finalize this rule before the new administration is in place. Accordingly, an injunction pending the outcome of this challenge will actually benefit BLM. Petitioners have provided undisputed evidence they will suffer imminent irreparable harm without the issuance of an injunction, and delay does not create any risk to the environment beyond the status quo. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) (the balance of harm tips in industry's favor where industry will incur economic costs and the government failed to show a sufficient likelihood of environmental harm).

## VI.     <u>AN INJUNCTION IS IN THE PUBLIC INTEREST</u>.

Finally, a preliminary injunction "would not be adverse to the public interest." *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012) (citation omitted). First, enjoining the Rule would not adversely impact the public's interest in a healthy environment. The Rule has virtually no impact on air quality, delivering a 0.0092 percent reduction of global GHG emissions. Moreover, both methane emissions and flaring volumes are decreasing as a percentage of production volume. A preliminary injunction would also sidestep the costly implementation of duplicative, unnecessary, and unlawful regulations.

Second, injunctive relief would prevent the lost revenue associated with decreased and shut in production, including lost revenues from non-federal/non-Indian leases. As discussed above, the Rule could render over 300 leases uneconomical, requiring production to be shut in. *See* API Comments at 6 ("[p]ermanent shut-in of wells could have significant consequences on resource conservation, royalty revenue, job loss, and the economic viability of operators").[43] The Rule would deliver a financial blow to many western states.

Finally, an injunction favors the public's interest because it will avoid the costs of administering a rule that is unlawful and unnecessary. A preliminary injunction would permit BLM to redirect its resources towards increasing production and revenue by, among other things, timely approving right-of-way applications and APDs. *See* 42 U.S.C. § 15921(a)(1) (BLM is statutorily required "[t]o ensure timely action on oil and gas leases and [APDs]"); *see also* Section III.B.1.c, *supra.* In sum, injunctive relief would serve public interest goals while maintaining the status quo until the final resolution of this matter. The Court's issuance of a preliminary injunction would not harm the environment and would avoid the financial and administrative costs of implementing unlawful and duplicative agency action.

## VII.   <u>CONCLUSION</u>

Petitioners request that the Court enjoin BLM from implementing the Rule prior to its effect date of January 17, 2017, until the resolution of this litigation for the reasons set forth herein. The Rule represents unlawful and unconstitutional agency action. The application of the Rule will cause the Petitioners and Petitioners' members irreparable harm, and the balance of

---

[43] *See also* API Comments at 6–7 (estimating that as many as 40 percent of wells could be permanently shut-in under the Rule because they would become uneconomical).

equities and public interest favor a preliminary injunction. Accordingly, the Court should grant the Motion for Preliminary Injunction.

Respectfully submitted this 23rd day of November, 2016.

DAVIS GRAHAM & STUBBS LLP

By: /s/ *Eric P. Waeckerlin*
Eric P. Waeckerlin – *Admitted Pro Hac Vice*
Kathleen Schroder – *Admitted Pro Hac Vice*
Erin K. Murphy – Wyo. Bar No. 7-4691
    1550 17th Street, Suite 500
    Denver, Colorado  80202
    Tel:    303.892.9400
    Fax:    303.893.1379
    Eric.Waeckerlin@dgslaw.com
    Katie.Schroder@dgslaw.com
    Erin.Murphy@dgslaw.com

    *Attorneys for Petitioners Western Energy*
    *Alliance and the Independent Petroleum*
    *Association of America*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 23rd day of November, 2016, the foregoing **MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** was filed electronically with the Court, using the CM/ECF system, which caused the foregoing to be served electronically upon the following:

C. Levi Martin
Assistant Deputy U.S. Attorney
United States Attorney's Office
J.C. O'Mahoney Federal Courthouse
2120 Capitol Avenue, Suite 4000
Cheyenne, WY 82001
Christopher.Martin@usdoj.gov
CaseView.ECF@usdoj.gov
breanne.m.ramirez@usdoj.gov
janee.woodson@usdoj.gov

Marissa Piropato
Clare Boronow
Assistant Deputy U.S. Attorneys
United States Attorney's Office
555 4th Street, NW
Washington, DC 20530
marissa.piropato@usdoj.gov
clare.boronow@usdoj.gov
efile_nrs.enrd@usdoj.gov

*Attorneys for The Honorable Sally Jewell*
*U.S. Secretary of the Interior, and for the U.S.*
*Bureau of Land Management*

*s/ Kathleen M. Daily*
of Davis Graham & Stubbs LLP