## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| STATE OF WYOMING and STATE OF MONTANA, | ) ) | |
| Petitioners, | ) ) | |
| STATE OF NORTH DAKOTA, | ) ) | |
| Intervenor-Petitioner, | ) ) | |
| vs. | ) ) | Case No. 2:16-CV-0285-SWS **(Lead Case)** |
| UNITED STATES DEPARTMENT OF THE INTERIOR; SALLY JEWELL, in her official capacity as Secretary of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT; and NEIL KORNZE, in his official capacity as Director of the Bureau of Land Management, | ) ) ) ) ) ) ) | **ORDER ON MOTIONS FOR PRELIMINARY INJUNCTION** |
| Respondents, | ) ) | |
| WYOMING OUTDOOR COUNCIL, et al.; EARTHWORKS; STATE OF CALIFORNIA and STATE OF NEW MEXICO, | ) ) ) ) | |
| Intervenor-Respondents. | ) | |

| | | |
|---|---|---|
| WESTERN ENERGY ALLIANCE, and the INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA, | ) ) ) | |
| Petitioners, | ) ) | |
| vs. | ) ) | Case No. 2:16-CV-0280-SWS |
| SALLY JEWELL, in her official capacity as Secretary of the United States Department of the Interior; and BUREAU OF LAND MANAGEMENT, | ) ) ) ) | |
| Respondents. | ) ) | |

This matter comes before the Court on the respective motions for preliminary injunction filed by the Petitioners and Intervenor-Petitioner (collectively, "Petitioners"): *Wyoming and Montana's Motion for Preliminary Injunction* (ECF No. 21),[1] *North Dakota's Motion for Preliminary Injunction* (ECF No. 39), and *Motion for Preliminary Injunction* filed by Petitioners Western Energy Alliance and the Independent Petroleum Association of America (ECF No. 12 in 16-CV-280).   The Court, having considered the briefs and materials submitted in support of the motions and the oppositions thereto, having heard witness testimony and oral argument of counsel, and being otherwise fully advised, FINDS and ORDERS as follows:

## BACKGROUND

On November 18, 2016, the Department of the Interior, Bureau of Land Management ("BLM") issued its final rule related to the reduction of waste of natural gas from venting, flaring, and leaks during oil and natural gas production activities on federal and Indian lands.   *See* 81 Fed. Reg. 83,008 (Nov. 18, 2016), *Waste Prevention, Production Subject to Royalties, and Resource Conservation* (the "Final Rule" or "Rule").   By their motions, Petitioners request that the Court enjoin the Rule before it takes effect on January 17, 2017.   Petitioners contend the Rule represents unlawful agency action because it exceeds BLM's statutory authority and is otherwise arbitrary and capricious.

---

[1] Unless otherwise noted, all filings referenced herein are from the docket in Case No. 2:16-CV-0285-S, which has been designated the Lead Case in these consolidated cases.  (*See* ECF No. 23.)

During oil production, operators frequently dispose of the associated gas by venting or flaring if the gas cannot be easily captured for sale or used on-site. Associated gas is the natural gas that is produced from an oil well during normal production operations and is either sold, re-injected, used for production purposes, vented (rarely) or flared, depending on whether the well is connected to a gathering line or other method of capture. AR at 457 (BLM Regulatory Impact Analysis for the Final Rule ("RIA") at 11). In addition, emergency flaring or venting may be necessary for safety reasons. *Id*. Venting is the release of gases into the atmosphere, such as opening a valve on a tank to relieve tank pressure. Flaring is the controlled burning of emission streams through devices called flares or combustors, releasing the byproducts of that combustion into the atmosphere. While venting or flaring is sometime unavoidable, it is also sometimes done in the absence of infrastructure to transport the gas to market.

The Department of the Interior ("DOI") has regulated venting and flaring to prevent the waste of federal and Indian natural gas since 1979 when it issued Notice to Lessees and Operators of Onshore Federal and Indian Oil and Gas Leases ("NTL-4A") (ECF No. 13-3), which the Waste Prevention Rule purports to replace. *See* 81 Fed. Reg. 83,008. NTL-4A prohibits venting and flaring of gas produced by oil wells, except when the gas is "unavoidably lost" as defined in NTL-4A and when the operator has sought and received BLM's approval to vent or flare. NTL-4A § IV.B. While unavoidably lost gas and gas vented or flared with BLM approval are exempted from royalties, gas that is "avoidably lost" – that is, gas lost due to an operator's negligence or failure to comply with the law – is subject to royalties. NTL-4A § I, II.A & C. NTL-4A also requires

operators to measure and report each month the volume of gas sold, avoidably or unavoidably lost, vented or flared, or used for beneficial purposes. NTL-4A § V.

Over the past decade, oil and natural gas production in the United States, and on BLM-administered leases, has increased dramatically. AR 366 (81 Fed. Reg. at 83,104). Domestic production from over 96,000 federal oil and gas wells now accounts for 11 percent of the National's natural gas supply and 5 percent of its oil supply. In FY 2015, federal and Indian leases produced oil and gas valued at $20.9 billion, which generated $2.3 billion in royalties. *Id*. BLM represents that this increase in oil production has been accompanied by "significant and growing quantities of wasted natural gas." *Id*. According to the DOI's Office Natural Resources Revenue ("ONRR"), between 2009 and 2015, operators reported venting or flaring 2.7 percent of the natural gas produced on BLM-administered leases – purportedly enough natural gas to supply over 6.2 million households for one year. AR at 367 (81 Fed. Reg. at 83,015). According to the BLM, the problem of natural gas loss on BLM-administered leases is growing, evidenced by a 318 percent increase in reported volumes of flared oil-well gas and an increased number of operator applications to vent or flare royalty-free (between 2005, 2011, and 2014, the number of applications per year went from 50, to 622, to 1,248). *Id*.

While recognizing that flaring is sometimes unavoidable, the BLM determined the majority of flaring on its leases results from the rate of new well construction outpacing the existing infrastructure capacity. AR 5 (81 Fed. Reg. at 6619) (Proposed Rule). The other situation resulting in substantial flaring of associated gas on BLM-administered leases is when capture and processing infrastructure has not yet been built out. *Id*.

Flaring in these circumstances may be due to insufficient information about how much gas will be produced or to an operator's decision to focus on near-term oil production rather than investing in the gas capture and transmission infrastructure necessary to realize a profit from the associated gas. *Id*.

In December 2007, the Royalty Policy Committee issued a report recommending the BLM update its rules and identified specific actions to improve production accountability. AR 369 (81 Fed. Reg. at 83,107). In 2010, the DOI's Office of Inspector General and the U.S. Government Accountability Office ("GAO") both recommended that BLM's regulations regarding the royalty-free use of gas be updated to take advantage of new capture technologies. *Id*. The GAO estimated that the economically recoverable volume of natural gas being wasted through venting and flaring at oil and gas production sites on federal and Indian lands represents about $23 million in lost royalties. AR 448 (RIA at 2). The GAO determined that around 40 percent of the natural gas vented and flared on onshore federal leases could be economically captured using currently available technologies. AR 16 (81 Fed. Reg. at 6630). In 2016, the GAO issued another report finding that BLM's regulations failed to provide operators clear guidance on accounting for and reporting lost gas. AR 369 (81 Fed. Reg. at 83,017).

Concluding there is a "compelling need to update [NTL-4A's] requirements to make them clearer, more effective, and reflective of modern technologies and practices" (*id*.), BLM published the Proposed Rule on February 8, 2016 (81 Fed. Reg. 6616). The BLM accepted public comments, met with stakeholders and state regulators in states with significant federal oil and gas production, and discussed the Rule with personnel from the

Environmental Protection Agency ("EPA") on over 40 conference calls between January 2015 and October 2016.  Only 9 months after publishing the Proposed Rule, BLM issued the Final Rule, with an effective date of January 17, 2017.

The Final Rule prohibits venting, except in certain limited situations such as emergencies or when flaring the gas is technically infeasible.   43 C.F.R. § 3179.6.  Unlike the Proposed Rule's monthly flaring limits, the Final Rule adopts a more flexible capture-percentage approach, modeled on North Dakota's regulations, that requires operators to capture a certain percentage of the gas they produce each month, excluding specified volumes of allowable flared gas.  43 C.F.R. § 3179.7; AR 374-76 (81 Fed. Reg. at 83,023-24).  Both the capture percentage and the flaring allowance phase in over a ten-year period.  *Id*.  The Final Rule allows operators to choose whether to comply with the capture targets on a lease-by-lease, county-wide, or state-wide basis.  *Id*. at 83,023.

The Final Rule retains NTL-4A's distinction between avoidably and unavoidably lost gas – with royalties owed on the former but not the latter – but eliminates BLM's discretion to make unavoidable loss determinations on a case-by-case basis and instead lists twelve categories in which a loss is always considered unavoidable.   43 C.F.R. § 3179.4.  Any gas flared in excess of the capture requirements is deemed an avoidable loss.  *Id*.  The Final Rule also requires operators to measure and report the amount of gas vented or flared above 50 million cubic feet per day.  *Id*. § 3179.9.  For leaks, the Final Rule requires that all operators inspect equipment twice a year and timely repair any leaks found.   *Id*. §§ 3179.301-304.   It also requires that operators update old and

inefficient equipment that contributes to waste and minimize gas lost from storage vessels and during well maintenance, drilling, and completion. *Id*. §§ 3179.201-204.

BLM characterizes the environmental benefits of reducing the amount of methane and other air pollutants released into the atmosphere as ancillary to the Rule's primary purpose of waste prevention. As phrased by New Mexico's counsel during the hearing on Petitioners' motions, in these circumstances, "the product is also the pollutant." Thus, there can be no escaping the potential conflict between the BLM's regulation of waste and loss of gas and the EPA's regulation of air pollutants from oil and gas operations. In an attempt to alleviate the obvious problems potentially caused by overlapping regulations, the Rule incorporates the following provisions: (1) allows compliance with EPA's emissions requirements for *new or modified sources* to satisfy the requirements of the Rule when both EPA regulations and the Rule apply, 43 C.F.R. §§ 3179.102(b), 3179.301(j); (2) exempts from the Rule equipment covered by existing EPA regulations, *id*. §§ 3179.201(a)(2), 3179.202(a)(2), 3179.203(a)(2); and (3) allows a State or tribe to *request* a variance from provisions of the Rule, so long as state or tribal regulations are at least as effective as the Rule in reducing waste, *id*. § 3179.401. *See* AR 362, 365 (81 Fed. Reg. at 83,010, 83,013). The decision to grant or deny a variance is within the BLM's discretion and is not subject to review. *Id*. § 3179.401(b). If the BLM approves a variance, the State or tribal regulations can be enforced by the BLM; however, the State's or tribe's "own authority to enforce its regulation(s) or rule(s) *to be applied under the variance* would not be affected by the BLM's approval of a variance." *Id*. § 3179.401(f) (emphasis added).

Petitioners contend the Rule is, in actuality, an attempt by BLM to regulate air pollution which it lacks authority to do, and the Rule, at best, duplicates, and at worst, undermines, the agencies tasked by Congress with regulating air quality.  Congress expressly delegated authority to the states and the EPA to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and productive capacity of its population."  42 U.S.C. § 7401(b)(1).  The Clean Air Act ("CAA") provides that "[e]ach State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State[.]"  *Id*. § 7407(a).  Thus, in enacting the CAA, Congress established a comprehensive scheme for regulating air quality through "a cooperative-federalism approach" under which the EPA develops baseline air quality standards that the states implement and enforce.  *Oklahoma v. U.S. E.P.A.*, 723 F.3d 1201, 1204 (10th Cir. 2013).  Petitioners ask this Court to enjoin BLM from implementing the Rule because it exceeds BLM's authority by comprehensively regulating air quality and is arbitrary and capricious.

## STANDARD OF REVIEW

To obtain a preliminary injunction, petitioners must show:  "(1) a likelihood of success on the merits; (2) that they will [likely] suffer irreparable harm; (3) that the balance of equities tips in their favor; and (4) that the injunction is in the public interest." *Petrella v. Brownback*, 787 F.3d 1242, 1257 (10th Cir. 2015).  *See also Glossip v. Gross*, 135 S. Ct. 2726, 2736 (2015) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  "[B]ecause a preliminary injunction is an extraordinary remedy, the movant's right to relief must be clear and unequivocal." *Fundamentalist Church of Jesus*

*Christ of Latter-Day Saints v. Horne*, 698 F.3d 1295, 1301 (10th Cir. 2012) (internal

quotation marks and citation omitted); *see also Johnson & Johnson Vision Care, Inc. v.*

*Reyes*, Nos. 15-4071, -4072, -4073, 2016 WL 7336568, at *3 (10th Cir. Dec. 19, 2016).

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citations omitted). *See also*

*Attorney General of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009);

*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (primary goal of

preliminary injunction is to preserve the pre-trial status quo). The grant or denial of a

preliminary injunction lies within the sound discretion of the district court. *Amoco Oil*

*Co. v. Rainbow Snow*, 748 F.2d 556, 557 (10th Cir. 1984). *See also Dine Citizens*

*Against Ruining Our Environment v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016).

## DISCUSSION

Petitioners challenge the Rule pursuant to the Administrative Procedure Act,

claiming the Rule should be set aside as arbitrary and capricious and in excess of the

BLM's statutory authority. *See* 5 U.S.C. § 706(2)(A) & (C).[2]

---

[2] The APA's scope of review provisions relevant here are:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

## A.    *Likelihood of Success on Merits*

Judicial review of agency action is governed by the standards set forth in § 706 of the APA, requiring the reviewing court to engage in a "substantial inquiry." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573-74 (10th Cir. 1994) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)).   While an agency's decision is entitled to a "presumption of regularity," the presumption does not shield the agency from a "thorough, probing, in-depth review."   *Id.* at 1574.   "[T]he essential function of judicial review is a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion."    *Id.* "Determination of whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consideration of whether on the facts, the agency's action can reasonably be said to be within that range." *Id.*

Under the arbitrary and capricious standard, a court must ascertain "whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made."   *Id.*   The agency must provide a reasoned basis for its

---

* * *
(2) hold unlawful and set aside agency action, findings, and conclusions found to be--
    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
    * * *
    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
    * * *
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."

5 U.S.C. § 706.

action and the action must be supported by the facts in the record. *Id.* at 1575. Agency action is arbitrary if not supported by "substantial evidence" in the administrative record. *Olenhouse*, 42 F.3d at 1575; *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pennaco Energy*, 377 F.3d at 1156 (quoting *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003)). "Because the arbitrary and capricious standard focuses on the rationality of an agency's decisionmaking process rather than on the rationality of the actual decision, '[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" *Olenhouse*, 42 F.3d at 1575 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 50 (1983)).

1. <u>BLM's Authority to Promulgate the Rule</u>

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). "Regardless of how serious the problem an administrative agency seeks to address, [] it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (quoting *ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517 (1988)). Accordingly, an "essential function" of a court's review under the APA is to determine "whether an agency acted within the scope of its authority." *WildEarth Guardians v. U.S. Fish and Wildlife Serv.*, 784 F.3d 677, 683 (10th Cir. 2015).

Where a case involves an administrative agency's assertion of authority to regulate a particular activity pursuant to a statute that it administers, the court's analysis is governed by *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See Brown & Williamson*, 529 U.S. at 132.

> Under *Chevron*, a reviewing court must first ask whether Congress has directly spoken to the precise question at issue. If Congress has done so, the inquiry is at an end; the court must give effect to the unambiguously expressed intent of Congress. But if Congress has not specifically addressed the question, a reviewing court must respect the agency's construction of the statute so long as it is permissible. Such deference is justified because the responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones, and because of the agency's greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated[.]

*Id*. (internal quotation marks and citations omitted). Unlike the situation in *State of Wyoming, et al. v. Dep't of Interior*, No. 15-CV-043-S (June 21, 2016) (setting aside BLM's final rule related to hydraulic fracturing), Congress has not directly announced that the precise activity in question not be subject to federal regulation. Absent clear expression of Congressional intent, the Court must proceed to the second step of the *Chevron* abyss.[3]

---

[3] As a sister federal district court has recently observed:

> *Chevron's* second step is the easier one to describe, because it is all but toothless: if the agency's decision makes it to step two, it is upheld almost without exception. *See* Ronald M. Levin, *The Anatomy of Chevron: Step Two Reconsidered*, 72 CHI. KENT L.REV. 1253, 1261 (1997) ("[T]he Court has never once struck down an agency's interpretation by relying squarely on the second *Chevron* step." (footnote omitted)); Jason J. Czarnezki, *An Empirical Investigation of Judicial Decisionmaking, Statutory Interpretation, and the Chevron Doctrine in Environmental Law*, 79 U. COLO. L.REV. 767, 775 (2008) ("Due to the difficulty in defining step two, courts rarely strike down agency action under step two, and the Supreme Court has done so arguably only twice."). Courts essentially never conclude that an agency's interpretation of an unclear statute is unreasonable.

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv*., 140 F. Supp. 3d 1123, 1168-69 (D.N.M. 2015).

The Mineral Leasing Act of 1920 ("MLA") creates a program for leasing mineral deposits on federal lands.[4]  Congress authorized the Secretary "to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of the [the MLA]." 30 U.S.C. § 189.  "The purpose of the Act is to promote the orderly development of oil and gas deposits in publicly owned lands of the United States through private enterprise." *Geosearch, Inc. v. Andrus*, 508 F. Supp. 839, 842 (D. Wyo. 1981) (citing *Harvey v. Udall*, 384 F.2d 883 (10th Cir. 1967)).  *See also Arkla Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 358 (8th Cir. 1984) ("broad purpose of the MLA was to provide incentives to explore new, unproven oil and gas areas through noncompetitive leasing, while assuring through competitive bidding adequate compensation to the government for leasing in producing areas").[5]

Specifically, for oil and gas leasing, the MLA, *inter alia,* establishes terms of the lease and royalty and rental amounts (30 U.S.C. §§ 223, 226(d)&(e)), requires the lessee to "**use all reasonable precautions to prevent waste of oil or gas developed in the land**" (*id*. § 225) (emphasis added), authorizes the Secretary of Interior to lease all public lands subject to the Act for oil and gas development (*id*. § 226(a)), directs the Secretary to regulate *surface*-disturbing activities (*id*. § 226(g)), and allows for the establishment of cooperative development plans to conserve oil and gas resources (*id*. § 226(m)).  Section 187 confirms the BLM's authority to issue regulations to carry out the MLA's waste prevention objectives:  "Each lease shall contain provisions for the purpose of insuring

---

[4] The MLA applies to deposits of coal, phosphate, sodium, potassium, oil, oil shale, gilsonite, or gas, and virtually all lands containing such deposits owned by the United States.  30 U.S.C. § 181.

[5] The Indian Mineral Leasing Act ("IMLA"), generally, grants the Secretary broad regulatory jurisdiction over oil and gas development and operations on Indian lands.  25 U.S.C. § 396d.

the exercise of reasonable diligence, skill and care in the operation of said property" and "a provision that **such rules . . . for the prevention of undue waste as may be prescribed by said Secretary** shall be observed."  (Emphasis added.)

The Federal Oil and Gas Royalty Management Act of 1982 ("FOGRMA"), 30 U.S.C. § 1751, creates a thorough system for collecting and accounting for federal mineral royalties.  FOGRMA reiterates Congress' concern about wasted oil and gas: "Any lessee is liable for royalty payments on oil or gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator of the lease, or due to the failure to comply with any rule or regulation, order or citation issued under this chapter or any mineral leasing law."  30 U.S.C. § 1756.  Like the MLA, FOGRMA contains a broad grant of rulemaking authority to achieve its objectives.  30 U.S.C. § 1751 ("The Secretary shall prescribe such rules and regulations as he deems reasonably necessary to carry out this chapter.").

The terms of the MLA and FOGRMA make clear that Congress intended the Secretary, through the BLM, to exercise its rulemaking authority to prevent the waste of federal and Indian mineral resources and to ensure the proper payment of royalties to federal, state, and tribal governments.[6]  "[T]he delegation of general authority to promulgate regulations extends to all matters 'within the agency's substantive field.' Because 'the whole includes all of its parts,' courts need not try to discern whether '*the particular issue* was committed to agency discretion.'"  *Helfrich v. Blue Cross & Blue Shield Ass'n*, 804 F.3d 1090, 1109 (10th Cir. 2015) (quoting *City of Arlington v. F.C.C.*,

---

[6] Petitioners do not challenge BLM's authority to regulate waste and promulgate rules governing royalty payments.

133 S. Ct. 1863, 1874 (2013)).  The question here, then, is not whether the MLA and FOGRMA specifically grant BLM the authority to regulate venting, flaring, and equipment leaks, but rather whether they unambiguously grant BLM authority to regulate the development of federal and Indian oil and gas resources *for the prevention of waste*. The answer to that question, largely undisputed by Petitioners, is "yes."  "The [MLA] was intended to promote wise development of these natural resources and to obtain for the public a reasonable financial return on assets that 'belong' to the public."  *California Co. v. Udall*, 296 F.2d 384, 388 (D.C. Cir. 1961).

The rub here, however, is whether the Rule, or at least certain provisions of the Rule, was promulgated *for the prevention of waste* or instead for the *protection of air quality*, which is expressly within the "substantive field" of the EPA and states pursuant to the Clean Air Act.  The BLM argues the Rule's benefits to air quality do not undercut its waste prevention purpose – to be sure, a regulation that prevents wasteful losses of natural gas necessarily reduces emissions of that gas.  The Court further agrees that the BLM is entitled to deference regarding the determination of how best to minimize losses of gas due to venting, flaring, and leaks, and incentivize the capture and use of produced gas.  In doing so, the Federal Land Policy and Management Act ("FLPMA") arguably directs BLM to consider any impact to "the quality of . . . air and atmospheric . . . values."  43 U.S.C. § 1701(1)(8).[7]  While the statutory obligations of two separate

---

[7] The Court does not agree with BLM's suggestion that FLPMA grants it broad authority to promulgate its own regulations directed at air quality control.  *See* Fed. Resp'ts' Br. at 25 (ECF No. 70 at 38).  FLPMA primarily establishes congressional policy that the Secretary manage the public lands under principles of multiple use and sustained yield.  At its core, FLPMA is a land use planning statute.  *See* 43 U.S.C. § 1712; *Rocky Mtn. Oil and Gas Ass'n v. Watt*, 696 F.2d 734, 739 (10th Cir. 1982) ("FLPMA contains comprehensive inventorying and land use

agencies may overlap, the two agencies must administer their obligations to avoid inconsistencies or conflict. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 532 (2007).

As stated above, an administrative agency may not exercise its authority "in a manner that is inconsistent with administrative structure that Congress enacted into law." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 125. Further, "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Id*. at 133. When enacting the Clean Air Act in 1970, Congress directly addressed the issue of air pollution and created a **comprehensive** scheme for its prevention and control.

> The Clean Air Act, 42 U.S.C. § 7401 *et seq*., enacted in 1970, is a comprehensive federal law that regulates air emissions under the auspices of the United States Environmental Protection Agency ("EPA"). Congress enacted the law in response to evidence of the increasing amount of air pollution created by the industrialization and urbanization of the United States and its threat to public health and welfare. 42 U.S.C. § 7401(a)(2). The Clean Air Act states that **air pollution prevention and control is the primary responsibility of individual states and local governments** but that federal financial assistance and leadership is essential to accomplish these goals. *Id*. § 7401(a)(3)-(4). Thus, it employs a "**cooperative federalism**" structure under which the federal government develops baseline standards that the **states individually implement and enforce**. *GenOn REMA, LLC v. EPA*, 722 F.3d 513, 516, No. 12–1022, 2013 WL 3481486, at *1 (3d Cir. July 12, 2013). In so doing, states are expressly allowed to employ standards more stringent than those specified by the federal requirements. 42 U.S.C. § 7416. The Clean Air Act makes the EPA responsible for developing acceptable national ambient air quality standards

---

planning provisions to ensure that the 'proper multiple use mix of retained public lands' be achieved"); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 57 (FLPMA establishes a dual regime of inventory and planning); *Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 555 (9th Cir. 2006) (FLPMA establishes requirements for land use planning on public land). *See also* "Memorandum of Understanding Among the U.S. Dep't of Agric., U.S. Dep't of Interior, and U.S. Envt. Prot. Agency, Regarding Air Quality Analyses and Mitigation for Federal Oil and Gas Decisions through the NEPA Process at 7 (June 23, 2011) (describing BLM's authority over air quality as limited to developing land use plans and providing for compliance with state and Federal pollution control laws, including the CAA), available at https://www.doi.gov/sites/doi.gov/files/migrated/news/pressreleases/upload/29704-Joint-MOU-Air-Quality-FINAL.pdf.

> ("NAAQS"), which are meant to set a uniform level of air quality across the country in order to protect the populace and the environment. *Id.* § 7409(b)(1). Before such levels are adopted or modified by the EPA, "a reasonable time for interested persons to submit written comments" must be provided. *Id.* § 7409(a)(1)(B). The EPA itself does not typically regulate individual sources of emissions. Instead, decisions regarding how to meet NAAQS are left to individual states. *Id.* § 7410(a)(1). Pursuant to this goal, each state is required to create and submit to the EPA a State Implementation Plan ("SIP") which provides for implementation, maintenance, and enforcement of NAAQS within the state. *Id.* All SIPs must be submitted to the EPA for approval before they become final, and once a SIP is approved, "its requirements become federal law and are fully enforceable in federal court." *Her Majesty the Queen in Right of the Province of Ontario v. Detroit*, 874 F.2d 332, 335 (6th Cir.1989) (citing 42 U.S.C. § 7604(a)). States are tasked with enforcing the limitations they adopt in their SIPs. They must regulate all stationary sources located within the areas covered by the SIPs, 42 U.S.C. § 7410(a)(2)(C), and implement a mandatory permit program that limits the amounts and types of emissions that each stationary source is allowed to discharge, id. §§ 7661a(d)(1), 7661c(a). "[E]ach permit is intended to be a source-specific bible for Clean Air Act compliance containing in a single, comprehensive set of documents, all [Clean Air Act] requirements relevant to the particular polluting source." *North Carolina, ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 300 (4th Cir.2010) (internal quotation marks omitted).

*Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3d Cir. 2013) (emphasis added).

Although the Rule's overlapping regulations themselves appear consistent with EPA regulations,[8] the Rule has potential conflict and inconsistency with the implementation and enforcement provisions of the CAA. The Rule upends the CAA's cooperative federalism framework and usurps the authority Congress expressly delegated under the CAA to the EPA, states, and tribes to manage air quality. *See Texas v. U.S. EPA*, 690 F.3d 670, 674-75 (5th Cir. 2012) (discussing the CAA's regulatory design which requires cooperation between federal government and states in administering the

---

[8] Indeed, BLM harmonized the definitions of certain terms with the overlapping EPA definitions in response to public comments, *see* 81 Fed. Reg. at 83,047, and certain other provisions of the Rule are taken directly from EPA air control requirements under 40 C.F.R. subparts OOOO or OOOOa.

CAA).   For example, the Rule recognizes compliance with the EPA's oil and gas production facility performance standards as compliance with the Rule; but no similar automatic compliance recognition exists for those very same standards if the EPA has approved enforcement authority to a state.   *See* AR 365 (81 Fed. Reg. at 83,013). Instead, the Rule requires states and tribes to request a variance from a particular BLM regulation, placing the burden on the states and tribes to prove its already-EPA approved rule "would perform at least as well as the BLM provision to which the variance would apply, in terms of reducing waste of oil and gas, reducing environmental impacts from venting and/or flaring of gas, and ensuring the safe and responsible production of oil and gas." *Id*.  The Rule further empowers the BLM to enforce the state or tribal rules if the variance is granted (*id.*), creating the potential for inconsistent or conflicting enforcement.

The Rule also conflicts with the statutory scheme under the CAA for regulating air emissions from oil and natural gas sources, particularly by extending its application of overlapping air quality provisions to existing facilities, which the EPA itself has not yet done.  *See* 42 U.S.C. § 7411(d) ("[t]he Administrator shall prescribe regulations which shall establish a procedure . . . under which each State shall submit to the Administrator a plan which (A) establishes standards of performance for any existing source for any air pollutant . . . and (B) provides for the implementation and enforcement of such standards of performance").  While the EPA has begun the rulemaking process for regulation of

existing sources under the CAA,[9] the BLM has hijacked the EPA's authority under the guise of waste management.[10]  AR 371 (81 Fed. Reg. at 83,019).

Of course, BLM has authority to promulgate and impose regulations which may have air quality benefits and even overlap with CAA regulations *if* such rules are independently justified as waste prevention measures pursuant to its MLA authority. "[A]n agency may not bootstrap itself into an area in which it has no jurisdiction." *Adams Fruit Co., Inc. v. Barrett*, 494 U.S. 638, 650 (1990) (internal quotation marks and citation omitted).  In other words, the BLM cannot use overlap to justify overreach. Petitioners contend the Rule is fundamentally an air quality regulation, not a resource conservation rule.

Portions of BLM's stated rationale for the Rule undermine Respondents' insistence that the Rule is foremost a waste prevention regulation that simply has incidental benefits to air quality:  "wasted gas . . . contribute[s] to regional and global air pollution problems of smog, particulate matter, and toxics, [and] vented or leaked gas contributes to climate change, because the primary constituent of natural gas is methane, an especially powerful greenhouse gas (GHG), with climate impacts roughly 25 times those of carbon dioxide ($CO_2$), if measured over a 100-year period, or 86 times those of

---

[9] On June 3, 2016, the EPA issued a final rule entitled "Oil and Natural Gas Sector: Emissions Standards for New, Reconstructed, and Modified Sources" published in the Federal Register at 81 Fed. Reg. 35824.  A challenge to EPA's Rules has been filed in the United States Court of Appeals for the District of Columbia Circuit.  *See North Dakota v. U.S. EPA*, 16-1242.

[10] One could also construe BLM's incorporation of EPA's air quality rules (OOOO and OOOOa) as doubling down in the event the challenge to EPA's final rule is successful.  The BLM arrogantly justifies the Rule's application of overlapping air quality regulations to existing sources by expressing its dissatisfaction with the length of the CAA process and the uncertainty of the resulting outcome.  *See* 81 Fed. Reg. 83,019 ("Given the length of this [CAA] process and the uncertainty regarding the final outcomes, and in light of the BLM's independent statutory mandate to prevent waste from Federal and Indian oil and gas leases based on information currently available, the BLM has determined that it is necessary and prudent to update and finalize this regulation at this time.").

$CO_2$, if measured over a 20-year period" (AR 361, 81 Fed. Reg. at 83,009); benefits of the Rule measured as cost savings to industry and "the environmental benefits of reducing the amount of methane [] and other air pollutants released into the atmosphere" (*id.* at 366, 83,014); "the waste of natural gas also imposes public health and environmental costs, in the form of air pollution, such as . . . emissions of methane, a powerful contributor to global warming and a primary target for reduction under the President's Climate Action Plan" (*id.*); "[a]bsent stronger provisions to reduce natural gas waste on Federal lands, the avoidable loss of gas will continue to threaten climate stability and undermine respiratory and cardiovascular health" (*id.* at 366-67, 83,014-15). Nevertheless, at this point, the Court cannot conclude that the provisions of the Rule which overlap with EPA/state air quality regulations promulgated under CAA authority lack a legitimate, independent waste prevention purpose or are otherwise so inconsistent with the CAA as to exceed BLM's authority and usurp that of the EPA, states, and tribes. Thus, Petitioners have not shown a clear and unequivocal right to relief.

      2.   <u>Whether the Rule is Arbitrary and Capricious</u>

Because the process by which an agency reaches a result must be "logical and rational," agency action must rest "on a consideration of the relevant factors." *Michigan v. E.P.A.*, 135 S. Ct. 2699, 2706 (2015). Agency action may be arbitrary and capricious where it has relied on factors which Congress did not intend the agency to consider. *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007). Taking at face value BLM's assertion that the Rule "aims to reduce the waste of natural gas," the cost-benefit analysis should have been considered primarily in terms of waste

prevention and not air pollution.  *See* AR 360, 366 (81 Fed. Reg. at 83,008, 83,014).

Instead, the BLM appears to be propping up the benefits of the Rule in air quality terms.

The BLM estimates the net benefits of the Rule outweigh its costs by "a

significant margin," producing net benefits ranging from $46 million to $204 million per

year depending on the discount rate used.  AR 365 (81 Fed. Reg. at 83,013).  Again,

depending on the discount rate used, BLM estimates costs (largely for engineering

compliance) will range from $110 million to $279 million per year.  *Id*.  BLM estimates

the Rule will result in monetized benefits of $209-$403 million per year.  Of the total

benefits, however, $189-$247 million is attributable to the environmental benefit of

reducing the amount of methane released into the atmosphere, and the remainder of $20-

$157 million to the costs savings that industry will receive from the recovery and sale of

natural gas.  AR 366 (81 Fed. Reg. 83,014).  *See also* RIA at 5.  BLM estimates the Rule

will produce additional royalties of $3-$14 million per year (depending on the discount

rate).[11]  *Id*.  Thus, the Rule only results in a "net benefit" if the "social cost of methane" is

allowed to be factored into the analysis.  RIA at 5-6.

The Court questions whether the "social cost of methane" is an appropriate factor

for BLM to consider in promulgating a resource conservation rule pursuant to its MLA

authority.  Moreover, it appears the asserted cost benefits of the Rule are predominately

based upon the emission reductions, which is outside of BLM's expertise, and not

attributable to the purported waste prevention purpose of the Rule.  The question then

---

[11] The total production of oil and gas in FY 2015 from federal and tribal leases generated over $2.3 billion in royalties.  AR 361 (81 Fed. Reg. at 83,009).

becomes whether the Rule is arbitrary and capricious because it imposes significant costs to achieve *de minimus* benefits. *See Michigan v. EPA*, 135 S. Ct. at 2707 ("Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions."). The BLM contends compliance costs are not the appropriate measure of the Rule's reasonableness, and it is appropriate to consider the environmental and related social benefits of the Rule. Again, though the Court has concerns in this regard, it cannot conclude at this point that the Rule is arbitrary and capricious and Petitioners have shown a clear and unequivocal right to relief. *See National Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (under step two of *Chevron,* court required to accept agency's construction of statute even if agency's reading differs from what court believes is best interpretation).

## B.     *Irreparable Harm*

The irreparable harm factor requires a party "seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). To satisfy the irreparable harm requirement, a movant must demonstrate "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)). A court must further assess "whether such harm is likely to occur before the district court rules on the merits." *Id*. (quoting *Greater Yellowstone Coal.*, 321 F.3d at 1260). "[T]he party

seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (internal quotation marks and citation omitted).

The State Petitioners assert irreparable harm resulting from the Rule's infringement on their sovereign authority and interests in administering their own regulatory programs governing air emissions from oil and gas production.  However, State regulations will continue to apply to oil and gas operations in tandem with the Rule, just as operators are currently subject to both States' rules and NTL-4A.  Further, the Rule requires BLM to coordinate with States when BLM action to enforce the Rule could adversely affect production of state or private mineral interests.  *See* 43 C.F.R. § 3179.12. While the overlapping and potentially conflicting regulations may interfere with the implementation and enforcement rights Congress gave to the states under the CAA, which would likely occur immediately upon the Rule becoming effective, the Court cannot say there is no legitimate, independent waste prevention purpose in those regulations, which is within the BLM's statutory authority to regulate.  Unlike the situation in *State of Wyoming, et al. v. Dep't of Interior*, No. 15-CV-043-S (Sept. 30, 2015) (Order on Motions for Preliminary Injunction), there has been no express announcement by Congress that the activities in question are not subject to federal regulation.  Because the overlapping regulations themselves appear consistent with the State Petitioners' own regulations, albeit with broader application to existing sources, the Court is not convinced the BLM's exercise of overlapping authority will interfere with

- 23 -

the States' sovereign interests in, and public policies related to, regulation of air emissions to the point of causing irreparable harm to the State Petitioners pending this Court's ruling on the merits.

The State Petitioners further contend irreparable harm through economic losses in the form of decreased tax revenue and lost jobs from delay in production and avoidance of development in states with significant federal land.  To be sure, to the extent such losses would be permanent, they are irreparable because the States cannot recover money damages from the federal government. *See Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) (explaining that while economic loss is usually insufficient to constitute irreparable harm, "imposition of money damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury"). However, the Court finds the States' assertion of economic loss to be speculative and unsupported by facts.  "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman*, 348 F.3d at 1189 (internal quotation and citation omitted).

Again, Petitioners have not shown BLM's overlapping "air quality" regulations to be inconsistent or significantly more onerous than the EPA's or the States' own regulations.  Neither have Petitioners shown the Rule's application will hamper or delay oil and gas production to the extent of causing imminent irreparable harm to the States' economic interests.  Moreover, the Rule provides for several economic exemptions where an operator shows, and BLM concurs, that compliance with the Rule's requirements "would impose such costs as to cause the operator to cease production and abandon

significant recoverable oil reserves under the lease." *See, e.g.,* 43 C.F.R. § 3179.102(c) (exemption from requirements related to well completion); § 3179.201(b)(4) (exemption from pneumatic controllers requirements); § 3179.202(f) (exemption from pneumatic diaphragm pump requirements); § 3179.203(c)(3) (exemption from storage vessels requirement); § 3179.303(c) (operator may request approval of a leak detection program that does not meet criterion specific in § 3179.303(b)).

The Industry Petitioners assert irreparable harm through: (1) costs of compliance; (2) disclosure of proprietary, confidential, and competitive information; and (3) payment of royalties on gas BLM has characterized as "avoidably lost." First, Industry Petitioners cannot demonstrate irreparable harm based on paying royalties on gas the Rule deems "avoidably lost" because, if Petitioners ultimately prevail on the merits and the Court sets aside the Rule's royalty requirements, any overpaid royalties can be recovered from the agency. *See* 30 U.S.C. § 1721a.

Additionally, though there are undoubtedly certain and significant compliance costs attached to the Rule, which are unrecoverable from the federal government, the Court is not convinced that these costs are of "such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." Industry Petitioners point to a statement in the Regulatory Impact Analysis that the "requirements to replace existing equipment would necessitate *immediate* expenditures." RIA at 4 (emphasis added). However, many of the Rule's requirements, including equipment replacement, do not take effect for a year. *See, e.g.,* 43 C.F.R. § 3179.7 (gas capture); § 3179.201 (pneumatic controllers); § 3179.202 (pneumatic diaphragm pumps); § 3179.203 (storage

- 25 -

vessels).   And any alleged expenses associated with "immediate action to begin Rule implementation and compliance planning" are simply too uncertain and speculative to constitute irreparable harm.  (*See* Sgamma Dec. ¶ 8; Industry Pet'rs' Br. at 49, Ex. 5.)

Industry Petitioners further argue the Rule will cause irreparable harm because it requires their members to provide to BLM information they consider proprietary, confidential, and competitive without assurances BLM can or will protect this information from disclosure.  "A trade secret once lost is, of course, lost forever."  *FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.*, 730 F.2d 61, 63 (2nd Cir. 1984).   The only specific example offered by Petitioners is the information required in the waste minimization plan that must accompany an APD, including anticipated production from a proposed well, the expected production decline curve of oil and gas from the well, and the expected Btu value for gas production from the proposed well.  *See* 43 C.F.R. § 3162.3-1(j)(2)(i)-(iv).   In response to a public comment requesting disclosure of waste minimization plans, BLM stated it will publicly post the waste minimization plans accompanying the APDs, "subject to any protections for confidential business information."  AR 395 (81 Fed. Reg. at 83,043).   The BLM further stated:  "operators routinely provide information to the BLM that they consider confidential; if they indicate on the Sundry Notice that the information is considered confidential, the BLM will handle the information in accordance with applicable regulations."  *Id*. at 403, 83,051.  The Industry Petitioners have not shown that BLM's existing confidentiality protections are inadequate to protect the information required in the waste minimization plans.  *See*

§§ 2.26-2.36.   Thus, the Court finds Petitioners have failed to establish that irreparable injury is likely in the absence of an injunction.

### C.    Balance of Equities and Public Interest

Having concluded Petitioners have not clearly and unequivocally established a likelihood of success on the merits and irreparable harm, the Court need not address the remaining factors that must be shown to obtain a preliminary injunction.   Still, the Court feels compelled to briefly touch upon these factors with a few observations.

The third preliminary injunction factor requires the Court to determine whether the threatened injury to the movants outweighs the injury to the opposing party under the injunction.   *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012); *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 889 (10th Cir. 2013).   The Court finds the balance of harms in this case does not tip decidedly in either side's favor.   Though Petitioners have not shown a likelihood of irreparable harm justifying an injunction, neither have Respondents shown substantial harm if an injunction were granted.   BLM has been regulating oil and gas waste pursuant to NTL-4A for 30 years.   The asserted need to update BLM's rules to account for technological advances does not seem so pressing that appreciable harm will result to BLM if the Rule's effective date is delayed pending this Court's ruling on the merits.   The asserted benefits of the Rule are found largely in the social benefits of reducing emissions of methane and other pollutants, which is already subject to EPA and state regulations.

Finally, public interest factors also support both sides of the issue.   The public interest is served by preserving the status quo, particularly where the balance of harms

- 27 -

does not tip decidedly in either side's favor.  *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1001-02 (10th Cir. 2004) (en banc) (Seymour, J., concurring in part, dissenting in part).  A preliminary injunction would not be adverse to the public interest in resource conservation because the BLM already has regulations in place to prevent waste and many of the Rule's provisions do not take effect for a year; nor would an injunction be adverse to the public interest in clean air because the EPA and State Petitioners already regulate emissions from oil and gas production, albeit not as broadly as the Rule contemplates.  A preliminary injunction would also sidestep the costly implementation of duplicative and potentially unlawful regulations.  So, while the Rule itself is arguably in the public's interest in resource conservation and air quality, a preliminary injunction would not necessarily be adverse to those interests.

## CONCLUSION

Under the MLA, Congress has vested the Secretary with the authority to prescribe rules for the prevention of undue waste of mineral resources.  Having done so, at this stage and applying the deference as required under *Chevron*, this Court cannot conclude the Rule enacted exceeds the Secretary's authority or is arbitrary and capricious.  Petitioners have not established their right to relief is clear and unequivocal.  Petitioners have failed to establish all four factors required for issuance of a preliminary injunction, so their respective motions must be denied.  The Court will, however, entertain Respondents' suggestion of an expedited briefing schedule on the merits.  THEREFORE, it is hereby

**ORDERED** that *Wyoming and Montana's Motion for Preliminary Injunction* (ECF No. 21), *North Dakota's Motion for Preliminary Injunction* (ECF No. 39), and the *Motion for Preliminary Injunction* filed by Petitioners Western Energy Alliance and the Independent Petroleum Association of America (ECF No. 12 in 16-CV-280) are **DENIED**; it is further

**ORDERED** that Respondents shall lodge the administrative record on or before **February 21, 2017**.  Petitioners shall file their opening briefs within thirty (30) days after the date on which the record is lodged.  Respondents shall file their briefs within twenty (2) days after service of the Petitioners' briefs.  Reply briefs shall be filed within ten (10) days after service of the Respondents' briefs.  The parties shall otherwise comply with U.S.D.C.L.R. 83.6.

DATED this 16th day of January, 2017.

Scott W. Skavdahl
United States District Judge